# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## NO. 23-1031

---

### QING QIN

**Plaintiff/Appellant,**

**v.**

### VERTEX, INC.

**Defendant/Appellee.**

---

**BRIEF AND VOLUME ONE OF APPENDIX**
**(Pages Appx0001 to Appx0024)**

---

**An Appeal from the Order of Judgment entered**
**in the United States District Court**
**for the Eastern District of Pennsylvania**
**on December 12th, 2022 at Civil Action No. 2:20-cv-02423**

---

**Ian M. Bryson, Esq.**
**Derek Smith Law Group, PLLC**
**1835 Market Street, Suite 2950**
**Philadelphia, PA 19103**
**(267) 857-0849**
**ian@dereksmithlaw.com**
**Attorneys for Appellant**

## <u>CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF<br>FINANCIAL INTEREST</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Qing Qin makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations:

    **None.**

2) For non-governmental corporate parties please list all publicly held companies that own 10% or more of the party's stock:

    **None.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.

    **None.**

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

    **Not a Bankruptcy Proceeding.**


Dated: <u>June 26, 2023</u>

*/s/ Ian M. Bryson, Esquire*
IAN M. BRYSON, ESQUIRE

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................iv

I. JURISDICTIONAL STATEMENT..............................................................1

    A. Basis for District Court's Jurisdiction......................................1

    B. Basis for Court of Appeals' Jurisdiction................................1

    C. Timeliness of Appeal..............................................................1

    D. Finality....................................................................................2

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW.............................3

III. STATEMENT OF RELATED CASES OR PROCEEDINGS........................5

IV. STATEMENT OF THE CASE.....................................................................6

    A. Procedural History..................................................................6

    B. Facts of the Case.....................................................................7

    C. The District Court's Opinion.................................................15

V. SUMMARY OF ARGUMENT...................................................................17

VI. ARGUMENT...............................................................................................18

    A. Standard of Review...............................................................18

    B. The District Court erred in granting summary judgment because there is sufficient evidence to create a genuine issue as to whether Vertex intentionally discriminated against Mr. Qin......................................................................................19

        1. The District Court ignored direct evidence linking Vertex's adverse decisions to Mr. Hart's racially motivated review of Mr. Qin..........................................................19

2.      The District Court ignored probative indirect and circumstantial evidence of Vertex's anti-Chinese animus.............................................................................23

a.      The District Court imposed too high a standard with respect to Mr. Qin's failure to promote claim and did not consider the record as a whole which shows that Mr. Qin qualified for a promotion but was denied the promotion because of "cultural differences."..................................................................23

b.      The District Court ignored evidence showing Mr. Qin's similarly situated comparator, Mr. Yawe, was treated more favorably than Mr. Qin during the 2018 performance review.........................................................25

C.      The District Court relied on factually incorrect information in accepting Vertex's proffered legitimate nondiscriminatory reason.....27

D.      The District Court's pretext analysis ignored the fact that Mr. Qin has shown that other, similarly-situated non-Chinese employees were treated more favorably.........................................................................29

E.      Contrary to the District Court's understanding, Mr. Qin did not admit to failing the PIP...................................................................................................30

F.      A reasonable jury could find that Mr. Qin endured a pervasive hostile work environment where he was called "China Man" and was denied advancement over 14 years while all of his non-Chinese colleagues were promoted.............................................................................................33

G.      The District Court erred in holding that Mr. Qin did not engage in protected activity for purposes of his retaliation claims....................35

H.      The District Court failed to apply the "timing plus other evidence" causation test to Mr. Qin's retaliation claims......................................38

VII.    CONCLUSION.................................................................................42

Certifications

# <u>TABLE OF AUTHORITIES</u>

**Statutes/Rules**

28 U.S.C. § 1291..............................................................................................1, 2

28 U.S.C. § 1331..................................................................................................1

42 U.S.C. §§ 2000e et seq. ("Title VII")...........................................................1, 6, 19

42 U.S.C. § 1981 ("Section 1981")....................................................................1, 6, 19

Fed. R. Civ. P. 56(c))..........................................................................................18

Fed. R. App. P. 4(a)..............................................................................................1

LAR 28.01............................................................................................................4

43 P.S. §§ 951-963 ("PHRA").............................................................................1, 6, 19

**Case Authorities**

<u>Caver v. City of Trenton</u>, 420 F.3d 243, 262 (3d Cir. 2005)....................................33

<u>Collins v. Kimberly-Clark Pennsylvania, LLC</u>, 247 F. Supp. 571, 589 (E.D. Pa.), <u>aff'd</u>, 708 F. App'x 48 (3d Cir. 2017).........................................................................................................................25

<u>Connelly v. Lane Const. Corp.</u>, 809 F.3d 780, 792-93 (3d Cir. 2016).....................38

<u>Crawford v. Metropolitan Gov't of Nashville and Davison Cty., Tennessee</u>, 555 U.S. 271, 277 (2009)........................................................................................36

<u>E.E.O.C. v. Metal Serv. Co.</u>, 892 F.2d 341, 347 (3d Cir. 1990).............................19

<u>Faush v. Tuesday Morning, Inc.</u>, 808 F.3d 208, 215 (3d Cir. 2015).......................18

<u>Fogleman v. Mercy Hospital, Inc.</u>, 282 F.3d 561, 562 (3d Cir. 2002).....................36

<u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994)...............................................29

Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)......................................24

Harley v. McCoach, 928 F. Supp. 533, 538 (E.D. Pa. 1996)...................................19

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)........................................26

Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001)....................................................................................................................24

Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259–261 (5th Cir.2009)............25, 26

Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 1999)..................25

Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007)..........38

Massie v. U.S. Dep't of Hous. & Urban Dev., 620 F.3d 340, 347 (3d Cir. 2010)...18

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).....................................................................................................................18

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).......................23

Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006)...........................35

Opsatnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 222–23 (3d Cir.2009)............26

Russell v. University of Toledo, 537 F.3d 596 (6th Cir.2008)...............................26

Staceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995)............20

Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997)................18

Walden v. Georgia-Pacific Corp. 126 F.3d 506, 515-16 (3d Cir. 1997)...........20, 22

Wilcher v. Postmaster Gen., 441 Fed. Appx. 879, 881–82 (3d Cir. 2011).......25, 26

Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004)....................................................................................................................38

# I.    JURISDICTIONAL STATEMENT

## A.    Basis for District Court Jurisdiction

The United States District Court for the Eastern District of Pennsylvania properly exercised subject-matter jurisdiction over the instant discrimination matter pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) because the action arises under the laws of the United States—specifically Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866.

## B.    Basis for Court of Appeals Jurisdiction

The United States Court of Appeals for the Third Circuit may properly exercise jurisdiction over the instant appeal pursuant to 28 U.S.C. § 1291 (final decisions of District Courts) because the Order dismissing the instant action disposed of all claims of the parties and is therefore "final" and appealable for purposes of 28 U.S.C. § 1291.

## C.    Timeliness of Appeal

There are no timeliness issues in this appeal. The appeal was filed within thirty (30) days of the District Court's entry of the Order denying reconsideration of the District Court's summary judgment decision, as required by Fed. R. App. P. 4(a). The Order of dismissal was dated December 12, 2022. Appx0019. Plaintiff's notice of appeal was filed 24 days later on January 5, 2023. Appx0020.

**D.    Finality**

The instant appeal is from a final order/judgment disposing of all the parties' claims. <u>See</u> 28 U.S.C. § 1291.

## II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Whether discriminatory statements in Mr. Qin's performance evaluation

constitute direct evidence of discrimination where there is evidence linking

the statements to the employer's adverse employment action.

Suggested Answer: Yes

2.   Whether Mr. Qin is entitled to an inference of discrimination where there is

evidence showing his non-Chinese coworker, who shared the same

supervisor, who was subject to the same standards, and who shared similar

job responsibilities was treated more favorably during the 2018 performance

evaluation.

Suggested Answer: Yes

3.   Applying the correct legal standards, is it plausible that Mr. Qin will be able

to prove discrimination because of race and national origin?

Suggested Answer: Yes

4.   Whether a reasonable jury could find Mr. Qin endured a pervasive hostile

work environment where he was called "China Man" and was denied

advancement over 14 years while all of his non-Chinese colleagues were

promoted.

Suggested Answer: Yes

5.    Whether Mr. Qin engaged in protected activity when he notified his supervisors and human resources that he was investigating whether race or national origin played a role in his non-promotion and when he complained about his racially motivated 2018 performance evaluation.

Suggested Answer: Yes

6.    Whether Mr. Qin is entitled to an inference of causation where the evidence shows that Vertex took adverse action against Mr. Qin as soon as the opportunity presented itself.

Suggested Answer: Yes


Pursuant to LAR 28.01, Plaintiff asserts that these issues were preserved by his opposition to Defendant's Motion for Summary Judgment and that no further preservation of this issue was necessary.

### III.   STATEMENT OF RELATED CASES OR PROCEEDINGS

There are no related cases or proceedings.

## IV.    STATEMENT OF THE CASE

### A.    Procedural History

Mr. Qin filed a Civil Action Complaint on October 27, 2020, asserting race and national origin discrimination claims Under Title VII, Section 1981, and the Pennsylvania Human Relations Act. Appx0032. Defendant filed an Answer to the complaint on November 10, 2020. Appx0062.

After the completion of the discovery, Defendant filed a Motion for Summary Judgment seeking dismissal of Plaintiff's claims for discrimination, hostile work environment and retaliation. Appx0081. Plaintiff filed a response on November 1, 2021. Appx0726. Defendant subsequently filed a reply. Appx1308. After briefing, the matter was reassigned. Appx0030 (docket item 43).

The District Court entered an Order granting summary judgment on October 18, 2022. Appx0018. On November 1, 2022, Plaintiff filed a Motion for Reconsideration of the Court's Order granting summary judgment. Appx0030 (docket item 46). Defendant filed a response. Appx0030 (docket item 47). Plaintiff filed a reply on November 22, 2022. Appx0030 (docket item 48). On December 12, 2022, the District Court entered an Order denying Plaintiff's motion for reconsideration and dismissing the matter in its entirety. Appx0019. This timely appeal followed. Appx0020.

**B.      Facts of the Case**

Mr. Qin was born in China on June 18, 1964, came to the United States as a student in 1985, and obtained his green card in or around 1992. Appx0819.

From October 16, 2000, until May 16, 2019, Mr. Qin worked at Vertex, Inc. as an Enterprise Software Architect, an entry level position. Appx0819. Vertex's software architects are ranked at three levels: (1) entry-level Architect, (2) Senior Architect and (3) Principal Architect. Appx0770, 0819-0820. Mr. Qin was the only ethnic Chinese employee among the company's 17 software architects. Appx0822, 0789, 0981. During his tenure at Vertex, Mr. Qin was called "China Man" on a number of occasions. Appx0926, 1078. One of his technology ideas was met with "Why don't you go back to China" by Bob Norton. Appx0822, 0926.

Mr. Qin held the highest education level in Vertex's architecture group: an Engineering Ph.D. from The University of Pennsylvania. Appx1161. He earned a CFA designation. Appx1163. He earned a Finance and Accounting Certificate from The Wharton School of the University of Pennsylvania Appx1165. And he earned advanced tax and accounting certificates from the National Tax Institute of SAT of China. Appx1167-1168.

Mr. Qin also made key contributions to Vertex's flagship tax software, O Series, including being the first person to demonstrate a rule-based technology to digitize sales tax rules, and architecting and designing the key component,

"TaxGIS." Appx0836-0837. Mr. Qin contributed many breakthrough innovation ideas in the field of tax technology, including the world-leading tax technology, PAM Library; and in 2018 he was the top contributor to Vertex's Bright Ideas system. Appx0771. In performing his job responsibilities, Mr. Qin had wide engagements, interactions and communications with many departments and management teams throughout Vertex. Appx0885-0890.

On average, it took about 8 years for a Vertex architect to be promoted from Enterprise Software Architect to Senior Enterprise Software Architect, and about 6 years for Mr. Qin's peers to be promoted from Senior Architect to Principal Architect. Appx0770, 0819-0820.

In or around 2004, Mr. Qin requested a promotion from Enterprise Software Architect to Senior Enterprise Software Architect. Appx0819. Mr. Qin never received any formal decision or explanation regarding the status of his promotion request in his entire 18+ years at Vertex. Appx0819. Rather, every time Mr. Qin raised the subject of promotion, feedback from his manager was always positive but dismissive, e.g., "you are on the top of the line," "I will get back to you in a few weeks," "I just need to discuss with the higher ups to firm things up," or "I need to wait until the budget is finalized," and so on. Appx0819.

In 2015, Mr. Qin was evaluated to meet every item of the job description of his target promotion position of Senior Enterprise Software Architect. Appx1061-

1066. However, despite Mr. Qin's outstanding performance, excellent qualifications and nearly two decades of experience with Vertex, he remained in an entry-level Architect position for his entire 19-year tenure—far longer than any other members of the architecture group who were less qualified. Appx0770, 0819-0820, 0846.

In 2018, Ed Read, Vertex's Finance Director, recommended Mr. Qin for promotion to Senior Enterprise Software Architect. Appx1170-1171. Mr. Qin's manager, Rick Harter signed off on Mr. Qin's promotion form in 2018. Appx0847. In February 2018, Mr. Harter stated that Mr. Qin's work was at senior level: "His current assignments certainly reflect senior level workload, so we just need to maintain and supplement that work for the rest of the year (and his career)." Appx1272. On December 14, 2018, Mr. Harter told Jen Kurtz, Vertex's Chief Technology Officer, that Mr. Qin "has accomplished the goals that Ed [Read] and I set for him earlier in the year." Appx1274.

For his 2018 performance evaluation, Mr. Qin was initially given a "Strong Contributor" rating by his manager, Mr. Harter. Appx0790. The 2018 evaluation period was from around October 2018 to February 8, 2019. Appx1158-1159.

In or around October 2018, at the beginning of Vertex's 2018 performance evaluation season, Mr. Qin confronted Mr. Harter and asked whether he had not been promoted because he is Chinese. Appx0856, 0912.

On December 13, 2018, Mr. Qin met with Andrea Falco in Vertex's Human Resources department to inquire about the company's procedures for reporting discrimination and harassment. Appx0989, 1282. Ms. Falco shared with others in the organization, including Nicole Sakowitz (who was also a decisionmaker on Mr. Qin's performance evaluation), that Mr. Qin had come to her office to ask about discrimination reporting procedures. Appx0282, 0995.

On December 14, 2018, Mr. Harter told Ms. Kurtz that he was having second thoughts about Mr. Qin's performance review: "I'm starting to feel uncomfortable about some of the issues (minor though they are) that have showed up in his review." Appx1284. Ms. Falco may have spoken with Mr. Harter about Mr. Qin's inquiry regarding the company's procedures for reporting discrimination and harassment. Appx0990, 0996.

After Mr. Qin's inquiries about whether his race and national origin were the cause of his non-promotion, Vertex downgraded his 2018 performance evaluation from a positive "Strong Contributor" rating to a negative rating of "Usually Meets Expectations." Appx0790. Mr. Qin's 2018 performance evaluation contains only *one* negative comment, which was written by Mr. John Hart. Appx0953-0956. Mr. Qin's manager, Mr. Harter, stated his decision to downgrade Mr. Qin's performance rating was based on Mr. Hart's negative review. Appx0851.

Mr. Hart's comment, the only negative review in Mr. Qin's performance evaluation, is full of stereotypical generalizations of Mr. Qin as a Chinese man, e.g., lacking social skills ("uncomfortable laughs," etc.), needing guidance and being less autonomous ("general passivity," "overly reliant upon others for direction," etc.). Appx0955-0956. All of the other reviewers for Mr. Qin's 2018 performance evaluation gave him positive reviews. Appx0955-0956.

After Mr. Qin received his poor rating, he interviewed each of his performance reviewers in order to understand and define his performance improvement objectives. Appx0787. When Mr. Qin interviewed John Hart, who wrote the only negative comment on Mr. Qin's 2018 performance review document, Mr. Hart told Mr. Qin that it was due to "cultural differences." Appx0823, 1128-1129, 1145-1146.

As a result of Mr. Qin's poor performance rating of "Usually Meets Expectations," he did not receive his earned promotion. Appx0282.

On March 31, 2019, Mr. Qin reported to Andrea Falco in Human Resources that the review comment was racially motivated. Appx1286.

On April 1, 2019, Mr. Qin explained the specific details of the racially motivated negative review comment (the only negative comment on his performance evaluation), and stated that the comment was "full of negative opinions with no factual basis, and they are not true in describing my behavior and

11

performance at Vertex. Rather, the text is full of descriptions of a stereotypical Chinese, e.g., lacking social skills ('uncomfortable laughs,' etc.), needing guidance/less autonomous ('general passivity,' 'overly reliant upon others for direction,' etc.)." Appx1126.

On April 2, 2019, Vertex placed Mr. Qin on a Performance Improvement Plan ("PIP") claiming that the PIP was due to his poor performance rating of "Usually Meets Expectations." Appx0282. Vertex signed Mr. Qin's PIP document on that day thus initiating the PIP process and termination procedures against him. Appx1124.

On April 12, 2019, Ms. Falco met with Mr. Qin to discuss the details of his complaint. Appx0999, 1288. At the April 12, 2019 meeting, Mr. Qin informed Ms. Falco that Mr. Hart said the negative review comment was due to "cultural differences." Appx1291-1292. Ms. Falco admitted that Mr. Hart's statement that his negative review of Mr. Qin was based on "cultural differences" is discriminatory. Appx1001.

On May 1, 2019, Ms. Falco concluded the human resources investigation into Mr. Hart's review of Mr. Qin and concluded that Mr. Hart's comments were "not appropriate" and agreed to completely remove Mr. Hart's evaluation from Mr. Qin's 2018 performance review. Appx1131.

However, even after removing Mr. Hart's racially motivated comments, Vertex kept Mr. Qin's poor rating "Usually Meets Expectations" even though there was no longer any basis for a poor rating (all of the other reviewers gave positive feedback). Appx1133-1136. Vertex kept Mr. Qin on the PIP even after its investigation concluded that the only negative review was "not appropriate" and even after removing it from Mr. Qin's performance evaluation. Appx0788.

On May 3, 2019, Vertex extended Mr. Qin's PIP for two more weeks so it could continue to pressure Mr. Qin to sign the General Release agreement to prevent him from taking legal action against the company. Appx0788, 1086.

To succeed on the PIP, Mr. Qin needed to be assigned to work on one of three specified projects. Appx0788, 0795, 0823-0824. But at the time, there was a management model change occurring at Vertex, and many projects—including those listed on the PIP—simply did not have decision makers with authority to admit people to work on the project. Appx0788, 0795, 0823-0824. This "no decisionmaker" obstacle was explicitly listed as a barrier to success on Mr. Qin's PIP and Vertex agreed by signing on the PIP. Appx0823-0824, 1123. Vertex knew that there were barriers that would prevent Mr. Qin from accomplishing the objectives and succeeding in his PIP. Appx0823-0824, 1123. Vertex intentionally did not remove those barriers to ensure Mr. Qin would fail the PIP. Appx0823-0824, 1123.

By May 6, 2019, Mr. Qin had not received any responses from the projects specified in the PIP; and since he knew there were no decisionmakers who could admit him to the projects, Mr. Qin tried reaching out to the budget managers. Appx1086, 1296. Mr. Qin never received any responses and therefore, was unable to join any projects specified in the PIP. Appx0824.

On May 16, 2019, Mr. Qin was terminated from Vertex. Appx0787, 0976. Mr. Qin was the only one in the architecture group of 17 architects who was terminated as a result of the 2018 performance review. Appx0789.

Mr. Qin's comparator, Fred Yawe, was a fellow architect in the same architecture group as Mr. Qin, who reported to the same manager, Mr. Rick Harter, during the 2018 performance review period. Appx0981; 1298-1299. Mr. Yawe is not Chinese. Appx0792, 0981.

Like Mr. Qin's 2018 performance evaluation, Mr. Yawe's 2018 performance was described by Mr. Harter as "not engaged" and "lacking in follow up." Appx1052. However Mr. Yawe was treated more favorably than Mr. Qin because, unlike Mr. Qin, Mr. Yawe was allowed to appeal to Human Resources about his performance rating of "Usually Meets Expectations." Appx0793, 0799; 1052-1055. As a result of being afforded the opportunity to appeal his poor rating, Mr. Yawe's final 2018 performance rating was upgraded from "Usually Meets Expectations" to "Strong Contributor." Appx0981. Thus, Mr. Yawe was not put on a PIP for his

2018 performance rating. Appx0792. As such, Mr. Yawe was not terminated as a result of his 2018 performance review. Appx0789. Mr. Qin was treated worse than Mr. Yawe because Vertex specifically told Mr. Qin that he was not allowed to appeal his performance evaluation. Appx1050.

### C.   The District Court's Opinion

The District Court granted summary judgment on all of Mr. Qin's claims. The District Court's decision rests on both factual and legal errors.

The District Court's disparate treatment analysis ignored direct evidence linking all of Vertex's adverse actions against Mr. Qin to discriminatory statements made by Mr. Hart in Mr. Qin's 2018 performance review. Appx0004-0006. The District Court also completely ignored probative comparator evidence showing that Mr. Yawe, Mr. Qin's similarly situated non-Chinese coworker, was treated more favorably than Mr. Qin during the 2018 performance review. Appx0007-0008.

The District Court failed to examine the evidence of the record in the light most favorable to Mr. Qin as the party opposing summary judgment and resolve all reasonable inferences in his favor. For example, the District Court accepted Vertex's proffered legitimate reason, Mr. Qin's alleged "lack of engagement," even though Mr. Qin presented competent evidence showing that he was fully engaged in Vertex's business operations. Appx0009-0010. The District Court inappropriately relied on one out of context quote from Mr. Qin's email as an

"admission" of his ineffectiveness in the PIP, instead of properly viewing the evidence in the light most favorable to Mr. Qin, which shows that the PIP was a fake one that was designed to fail him. Appx0010.

The District Court also wrongly limited the route by which Mr. Qin could prove his hostile work environment claim by only considering three coworkers' comments, rather than the totality of the circumstances—such as Vertex's refusal to promote him from an entry-level position for his entire 19-year tenure with the company. Appx0010-0012.

With respect to Mr. Qin's retaliation claims, the District Court mistakenly characterized Mr. Qin's attempts at reporting discrimination based on his status as a Chinese man as mere "questions" and "desire to understand procedures." Appx0012-0013. The District Court also failed to apply the "timing plus other evidence" causation test, ignoring the fact that Vertex jumped at the first opportunity to take adverse action against Mr. Qin when it discovered he was investigating whether race or national origin were the reasons for his longtime non-promotion. Appx0013-0016.

## V.    SUMMARY OF ARGUMENT

The District Court's entry of summary judgment for Vertex was an error. The court downplayed evidence showing that decisionmakers chose not to promote Mr. Qin, and ultimately fire him, because of anti-Chinese statements in his 2018 performance evaluation. The court ignored evidence showing Mr. Qin was treated less favorably than his non-Chinese coworkers.

The court erroneously limited its hostile work environment analysis to sporadic racial slurs, failing to credit evidence that Mr. Qin was the only Chinese employee in Vertex's architecture group, and the only employee who was not promoted from an entry-level position in his long tenure with the company. Viewing the evidence in the light most favorable to Mr. Qin, a reasonable jury could find that he endured a work environment hostile to Chinese people.

In its causation analysis of Mr. Qin's retaliation claims, the District Court wrongly emphasized the two-month time duration between the protected activity on March 31, 2019 and Mr. Qin's termination in May 2019; and ignored all of the evidence showing Vertex took the first opportunity to take adverse action against Mr. Qin when it placed him on the PIP on April 2, 2019 – only two days later. Appx1122-1124, 1286.

Contrary to the District Court's conclusions, a reasonable jury could find that Vertex subjected Mr. Qin to discrimination, a hostile work environment, and harassment based on his Asian race and Chinese national origin.

## VI.    ARGUMENT

The District Court's order granting summary judgment on Plaintiff's discrimination, hostile work environment and retaliation claims should be reversed because there are genuine issues of material fact to be decided by the jury.

### A.    Standard of Review

The Third Circuit Court of Appeals reviews the grant of summary judgment *de novo*, applying the same standard as the District Court. Faush v. Tuesday Morning, Inc., 808 F.3d 208, 215 (3d Cir. 2015). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Massie v. U.S. Dep't of Hous. & Urban Dev., 620 F.3d 340, 347 (3d Cir. 2010) (citing Fed.R.Civ.P. 56(c)).

The Court is required to examine the evidence of the record in the light most favorable to Plaintiff as the party opposing summary judgment and resolve all reasonable inferences in his favor. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997).

**B.** **The District Court erred in granting summary judgment because there is sufficient evidence to create a genuine issue as to whether Vertex intentionally discriminated against Mr. Qin.**

Title VII, and the PHRA make it unlawful for an employer to discriminate against an employee in the terms and conditions of employment because of race or national origin. 42 U.S.C., § 2000e-2(a)(1); 43 P.S. § 955. Section 1981 also prohibits race discrimination with respect to adverse employment actions. See Harley v. McCoach, 928 F. Supp. 533, 538 (E.D. Pa. 1996) ("[P]laintiff's Title VII, PHRA and § 1981 claims all fall under the same analytical framework, and will therefore be examined together.")

"A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990). Discriminatory intent can be proved either through direct evidence or indirect and circumstantial evidence. Id.

**1.** **The District Court ignored direct evidence linking Vertex's adverse decisions to Mr. Hart's racially motivated review of Mr. Qin.**

Mr. Qin has satisfied his burden of presenting direct evidence of discrimination. Direct evidence of discrimination is evidence that "is so revealing of discriminatory animus that it is not necessary to reply on any presumption from

19

the prima facie case to shift the burden of production." Staceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995). Discriminatory statements constitute direct evidence of discrimination where there is evidence linking the speaker to the employer's adverse employment action. See Walden v. Georgia-Pacific Corp. 126 F.3d 506, 515-16 (3d Cir. 1997). In Walden, the Third Circuit found that discriminatory statements written in a memorandum by the plaintiff's supervisor did not constitute direct evidence of discrimination because there was no evidence linking the person who wrote the memo to the employer's decision to terminate the plaintiffs. Id. The Walden court reasoned that

> although Watson's comments are quite probative of retaliatory animus, it would be pure speculation to conclude that Schutte acted on the basis of Watson's advice. As Armbruster shows, statements even by decisionmakers cannot constitute direct evidence if there is no evidence somehow linking that person to the actual decision. Under such circumstances, we could not say that Watson's statements directly reflect retaliatory animus on the part of those involved in the decision.

Id. at 516.

Here, Mr. Hart's admission that the negative evaluation he wrote for Mr. Qin's 2018 performance review was based on "cultural differences" is direct evidence of discrimination because there is evidence linking Mr. Hart's statement to Vertex's decision to remove Mr. Qin's promotion, place him on a PIP, and terminate his employment.

The District Court wrongly characterized Mr. Hart's statement as a "casual remark" and therefore declined to view the statement as direct evidence of discrimination. Appx0005. The District Court acknowledged that "John Hart . . . had informed Plaintiff that Hart's negative review of Plaintiff had been due to Plaintiff's 'cultural differences.'" Id. However, the District Court concluded that "the comments of . . . John Hart . . . amount to what are considered 'stray remarks' [that] are not direct evidence of discrimination." Id.

In reaching this conclusion, the District Court failed to appreciate the fact that, while Mr. Hart was not the ultimate decisionmaker, all of Vertex's adverse actions against Mr. Qin stemmed from Mr. Hart's discriminatory review. The District Court ignored the fact that in 2018, Mr. Hart wrote the only negative performance review on Mr. Qin's work performance. Appx0955-0956. Mr. Hart's review, the only negative comment in Mr. Qin's performance evaluation, is full of stereotypical generalizations of Mr. Qin as a Chinese man, e.g., lacking social skills ("uncomfortable laughs," etc.), needing guidance and being less autonomous ("general passivity," "overly reliant upon others for direction," etc.). Id.

When Mr. Qin asked Mr. Hart about the negative review, Mr. Hart admitted that it was due to "cultural differences." Appx0823, 1128-1129, 1145-1146. This is direct evidence that Mr. Qin's performance review was not based on his work, but on his race and national origin.

The District Court ignored the fact that Mr. Qin's manager, Rick Harter, admitted that he based Mr. Qin's poor performance rating upon Mr. Hart's negative review, which Mr. Hart said was based on "cultural differences," i.e., Mr. Qin's race and national origin. Appx0851. The poor performance rating in turn resulted in Vertex taking away Mr. Qin's earned and planned promotion, which would have been Mr. Qin's only promotion during his tenure of nearly 19 years at Vertex. Appx0282. Mr. Qin's PIP was also caused by his poor performance rating (again based solely upon Mr. Hart's racially motivated review). Appx0282.

When Mr. Qin complained about Mr. Hart's discriminatory comments, Vertex's Human Resources department concluded that Mr. Hart's comment was "not appropriate" and agreed to remove it from Mr. Qin's 2018 review. Appx1131. However, even after removing the racially motivated negative comment (the only reason for the PIP), Vertex kept Mr. Qin's poor rating "Usually Meets Expectations" and ultimately fired Mr. Qin. Appx1133-1136.

The District Court ignored these critical facts, which show that Vertex decisionmakers received Mr. Hart's 2018 review of Mr. Qin, knew that it contained statements reflecting discriminatory animus, and relied upon the discriminatory statements in deciding not to promote Mr. Qin, place him on a PIP and terminate his employment. Mr. Qin has presented direct evidence that Vertex shared Mr. Hart's discriminatory animus. Walden, 126 F.3d at 516.

### 2. The District Court ignored probative indirect and circumstantial evidence of Vertex's anti-Chinese animus.

Where the Plaintiff offers indirect or circumstantial evidence of discrimination, the <u>McDonnell Douglas</u> burden-shifting framework applies. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973).

The <u>McDonnell-Douglas</u> framework is a three-step analysis. <u>Id</u>. First, the plaintiff must establish a prima facie case of discrimination by showing they are a member of a protect class, they were qualified for the position they sought to attain or retain, they suffered an adverse employment action, and the adverse employment action occurred under circumstances that could give rise to an inference of discrimination. <u>Id</u>. Second, if the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>Id</u>. Third, if the defendant articulates a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show by a preponderance of evidence that the defendant's reason is pretextual. <u>Id</u>.

### a. The District Court imposed too high a standard with respect to Mr. Qin's failure to promote claim and did not consider the record as a whole which shows that Mr. Qin qualified for a promotion but was denied the promotion because of "cultural differences."

The district Court's holding that Mr. Qin could not prove discrimination for his failure to promote claim rests on both factual and legal errors. Factually, the

court overlooked and minimized Mr. Qin's evidence and failed to view it in the light most favorable to him as required. See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 140 (3d Cir. 2001). Legally, the court imposed too high a standard on Mr. Qin and did not consider the totality of the circumstances. See Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("The precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic.").

The District Court ignored all of the relevant evidence and erroneously implied that in order to succeed on his failure to promote claim, Mr. Qin needed to show that Vertex sought applicants for Mr. Qin's promotion target or that it selected another candidate over him. Appx0007 ("…there has been no evidence that Defendant sought applicants for the Senior Architect position, . . ."). While a showing that the position for which he applied remained open after his rejection or was filled by someone else may help show discrimination, it is not an indispensable element of such a claim. See Furnco Const. Corp., 438 U.S. at 577 (holding that the requirements of the prima facie case can vary depending on the totality of the circumstances).

It is not necessary for Mr. Qin to make a special showing that Vertex sought applicants for the Senior Architect position because the record as a whole shows Vertex denied Mr. Qin the promotion because of his race and national origin. The

fact is, in 2018 Vertex was seeking applicants for the Senior Architect position, and Mr. Qin was initially recommended for the position by Mr. Read. Appx1170-1171. His manager, Mr. Harter, even signed onto the promotion recommendation initially. Appx0847. But Mr. Qin's earned promotion was later reversed because of the racially motivated negative performance review written by Mr. Hart. Appx0282. Such evidence is part of the "totality of the circumstances" under which this Court must evaluate Mr. Qin's claim. See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 168 (3d Cir. 1999).

> **b.    The District Court ignored evidence showing Mr. Qin's similarly situated comparator, Mr. Yawe, was treated more favorably than Mr. Qin during the 2018 performance review.**

The District Court completely ignored the comparator evidence showing that Mr. Yawe, Mr. Qin's similarly situated non-Chinese coworker, was treated more favorably than Mr. Qin during the 2018 performance review. It is well established that a plaintiff can establish an inference of discrimination by demonstrating that "similarly situated persons outside of the protected class were treated more favorably." Collins v. Kimberly-Clark Pennsylvania, LLC, 247 F. Supp. 571, 589 (E.D. Pa.), aff'd, 708 F. App'x 48 (3d Cir. 2017).

To be similarly situated, the comparator does not need to be identically situated, but must be similar to plaintiff in "all relevant respects." Wilcher v. Postmaster Gen., 441 Fed. Appx. 879, 881–82 (3d Cir. 2011) (citing Lee v. Kansas

25

City S. Ry. Co., 574 F.3d 253, 259–261 (5th Cir.2009); Russell v. University of Toledo, 537 F.3d 596 (6th Cir.2008)) (accepting the "all relevant respects" test applied by other circuits); Opsatnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 222–23 (3d Cir.2009) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997)) (" 'similarly situated' does not mean identically situated ...").

Factors relevant to the analysis are whether the employees dealt with the same supervisor, were subject to the same standards, shared similar job responsibilities and the nature of the misconduct. Wilcher, 441 Fed.Appx. at 881–82 (internal citations omitted). Whether comparators are similarly situated is generally a question of fact for the jury. Id. Summary judgment is inappropriate where there is evidence from which a jury could conclude the parties were similarly situated. See id.

Here, the District Court acknowledged that a plaintiff could establish an inference of discrimination by "demonstrating that similarly situated persons outside the protected class were treated more favorably" but District Court's opinion omits any mention of Mr. Yawe. Appx0007.  In concluding that "Plaintiff has failed to provide evidence which would allow this Court to infer discrimination" the District Court ignored evidence that Mr. Yawe, who is not Chinese, was a fellow architect of Mr. Qin in the same architecture group under the same manager (Mr. Harter) during the 2018 performance review period.

Appx0981; 1298-1299. Both Mr. Yawe and Mr. Qin received the same low performance rating of "Usually Meets Expectations" during the same 2018 performance review and both were alleged be lacking engagement and follow up. Appx0793, 0799; 1052-1055. The District Court ignored the fact that Mr. Yawe, unlike Mr. Qin, was allowed to appeal to Human Resources to upgrade his rating, thus avoiding being placed on a PIP and fired. Appx0793, 0799; 1052-1055. In contrast, Mr. Qin was not allowed to make any appeal. Appx1050. As a result, Mr. Qin was placed on a PIP and ultimately terminated.

The District Court ignored this evidence and thus failed to afford Mr. Qin an inference of discrimination based on the fact that he and Mr. Yawe were similar in all relevant respects but Mr. Qin was treated less favorably.

### C.    The District Court relied on factually incorrect information in accepting Vertex's proffered legitimate nondiscriminatory reason.

The District Court's analysis of Vertex's proffered legitimate nondiscriminatory reason relied upon factually incorrect information to conclude that Mr. Qin's alleged "lack of engagement" was a legitimate reason for Vertex's discriminatory actions. Appx0008. The District Court stated "Defendant has offered legitimate non-discriminatory reasons for not promoting Plaintiff and terminating his employment. . . .With respect to the failure to promote claim, Defendant alleges that Plaintiff . . . spent most of the year—between August 27,

2018 and March 29, 2019—submitting eleven ideas to Defendant's 'idea box,' none of which were adopted by Defendant." Id.

First, for the performance year 2018, the time from August 27, 2018 to the end of that year is less than half of the year 2018—it was not "most of the year." Second, the "eleven ideas" that the District Court referred to resulted from Mr. Qin's prior years' work and are Vertex's intellectual property. Appx0821. The effort to submit those ideas into the system was minimal because it only required a small amount of data to be entered into an online form—this data entry effort did not involve the invention of those ideas, which had taken a lot more of Mr. Qin's effort over several previous years. Id.

Importantly, the District Court Opinion stated that "none of the ideas were adopted by Vertex. Appx0008. The District Court ignored the fact that one of the ideas, the Excise Tax project, actually was adopted by Vertex, and Mr. Qin was assigned to work on it until the date of his termination. Appx1048, 1276, 1294. The District Court's decision to accept Vertex's proffered reason, "lack of engagement," was based on factually incorrect information. There are genuine issues of material fact regarding Vertex's "lack of engagement" reason because the evidence actually shows that Mr. Qin was fully engaged in Vertex's business operations by submitting ideas that concretely contributed to the company's innovation efforts.

**D.    The District Court's pretext analysis ignored the fact that Mr. Qin has shown that other, similarly-situated non-Chinese employees were treated more favorably.**

A plaintiff can establish pretext by showing, for example, "that the employer treated other, similarly situated persons not of his protected class more favorably." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

The District Court concluded that "Plaintiff also has not shown that other, similarly situated non-Chinese employees were treated more favorably" but the court's pretext analysis ignored the fact that Mr. Yawe, a similarly situated non-Chinese coworker who was "not engaged," was treated more favorably than Mr. Qin. Appx0010.

The Court's Opinion made no motion of Mr. Yawe, who during the same 2018 performance review was reviewed as "not engaged" and "lacking follow up." Appx1052. Mr. Yawe appealed to HR about his performance rating of "Usually Meets Expectations." Appx0793, 0799; 1052-1055. Mr. Yawe's final 2018 performance rating was changed to "Strong Contributor," which is not a poor rating of "Usually Meets." Appx0981. As a result, Mr. Yawe was not put on a PIP for his 2018 performance review period. Appx0792. Mr. Fred Yawe was not terminated as a result of his 2018 performance review. Appx0789. The District Court ignored the fact that Mr. Yawe's being "not engaged" was treated more favorably than Mr. Qin's "lack of engagement." The comparator evidence shows

that Vertex's proffered "lack of engagement" reason for placing Mr. Qin on the PIP was pretext for discrimination.

The District Court's analysis of Vertex's proffered reason for Mr. Qin's termination (the failed PIP) ignored the fact that the root cause of Mr. Qin's termination at the end of the PIP was the racially motivated negative performance review by Mr. Hart. Without the racially motivated review, Vertex would not have placed Mr. Qin on the PIP to begin with and he would not have been terminated because of it.

**E.    Contrary to the District Court's understanding, Mr. Qin did not admit to failing the PIP.**

The District Court relied on only one out of context quote from Mr. Qin's email as supposed evidence of his PIP failure and ignored the fact that the same email proves Vertex intentionally failed to remove known obstacles in order to ensure Mr. Qin would fail the PIP. The District Court stated, "With respect to the termination claim, Defendant asserts that Plaintiff had been terminated for failing to satisfactorily complete his PIP." Appx0008. The District Court then quoted part of Mr. Qin's email as evidence for his ineffectiveness in the PIP: "Plaintiff stated: 'since my pip was extended for two weeks, I put some thoughts on how to seek better outcome than the past 5 weeks, which admittedly had not been effective." Appx0009-0010. The District Court then stated that there was no evidence to

establish pretext: "Plaintiff has failed to proffer evidence . . . that he had been subjected to unlawful discriminatory treatment by Defendant . . ." Appx0010.

While Mr. Qin's termination may have technically resulted from the PIP process, the PIP itself was caused by Mr. Qin's poor rating which resulted specifically from Mr. Hart's racially motivated performance review. Appx0851. Mr. Qin's earned planned promotion was also taken away because of the poor rating. Appx0282. Therefore, Mr. Qin's termination was caused by his race and national origin, and the company's proffered reason (PIP failure) was pretext for discrimination.

The District Court inappropriately relied on the out of context quote from Mr. Qin's email as evidence for his ineffectiveness in the PIP, and it ignored ample evidence that Mr. Qin's PIP was a fake one that was designed to fail him. To succeed on the PIP, Mr. Qin needed to be assigned to work in one of the three projects listed on the PIP. Appx0788, 0795, 0823-0824. At the time, there was a management model change going on at Vertex, and many projects—including those listed on the PIP—simply did not have decision makers with authority to admit people to work on the project. Appx0788, 0795, 0823-0824. This "no decisionmaker" obstacle was explicitly listed as a barrier to success on Mr. Qin's PIP and Vertex agreed by signing on the PIP. Appx0823-0824, 1123. In the quoted email, which the District Court calls an "admission from Plaintiff regarding his

own ineffectiveness throughout the PIP," Mr. Qin was telling his then-manager, Mr. Norm Stahlheber, that he had not been able to identify any decisionmakers who could assign him to the projects, and Mr. Qin was proposing additional steps to overcome the "no decisionmaker" obstacle. Appx0548, 1122-1124.

Immediately following the quoted text, Mr. Qin stated, in the same email, "Given the current timing in the budget cycle, I suspect some unconventional approaches may be necessary in the next two weeks of my pip 2.0. Plan A, Seeking budget managers' input – in addition to the development managers. I need to take actions to identify them and reaching out." Appx0548. This clearly proves that the "no decisionmaker" obstacle on Mr. Qin's PIP was not removed by Vertex. Without decisionmakers, Mr. Qin was unable to be assigned to any of those projects, and therefore he had no chance at all to succeed in his PIP. In fact, throughout the PIP, Mr. Qin had not received any responses, yes or no, from anyone, which was clear evidence that there was simply no one with authority to make the decision to assign Mr. Qin to the projects—that is, he had no chance to succeed his PIP. Appx0824.

In short, the District Court ignored the fact that the root cause for Mr. Qin's termination was the racially motivated review, it ignored all the facts showing Mr. Qin's PIP was deliberately designed to fail him, and it took an out of context email

quote to mistakenly believe Vertex's proffered reason for termination. The

proffered reason, "PIP failure," is pretext.

**F.** **A reasonable jury could find that Mr. Qin endured a pervasive hostile work environment where he was called "China Man" and was denied advancement over 14 years while all of his non-Chinese colleagues were promoted within a few years.**

To make out a prima facie case of hostile work environment, the plaintiff

must show he "(1) suffered intentional discrimination because of his [race or

national origin]; (2) the discrimination was pervasive and regular; (3) it

detrimentally affected him; (4) it would have detrimentally affected a reasonable

person of the same protected class in his position; and (5) there is a basis for

vicarious liability." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). The

Court must consider the "totality of the circumstances" and "concentrate not on

individual incidents, but on the overall scenario." Id.

In its analysis of Mr. Qin's hostile work environment claim, the District

Court ignored the fact that, not only did Mr. Qin endure anti-Chinese remarks such

as "Go back to China" and "China Man," but also that it took Mr. Qin 14 years to

finally learn the concrete reason for his longtime non-promotion: race and national

origin. The District Court only considered three coworkers' comments, rather than

the totality of the circumstances in reaching its conclusion that Mr. Qin's work

environment was not hostile toward Chinese people. It ignored the critical facts

proving that Mr. Qin's longtime non-promotion, which ended with a denial of his earned planned promotion, was indeed due to his race and national origin.

The District Court stated, "When assessing whether an environment is hostile or abusive, the Third Circuit reiterates the importance of considering the 'totality of the circumstances' and 'concentrat[ing] not on individual incidents, but on the overall scenario." Appx0011. The District Court concluded that "in this case, Plaintiff's showing of a hostile work environment stems **in part** from the three comments made by his coworkers." Id (emphasis added). Despite using the phrase "in part," the District Court ultimately considered only the three coworker comments, not the circumstances in totality: "In sum, Plaintiff's assertion of isolated comments . . . could not lead a reasonable jury to conclude that Plaintiff had been subject to a hostile work environment." Appx0012.

In particular, the District Court ignored the facts of Mr. Qin's 14-year journey of applying for a promotion, Appx0819, which clearly reflect the hostile nature of the work environment towards his race and national origin. After joining Vertex, Mr. Qin first requested a promotion from Enterprise Software Architect to Senior Enterprise Software Architect in or around 2004. Appx0819. He never received any formal or written response regarding his promotion application status. Appx0819. In 2018, after years of frustration and having exhausted all other

34

possibilities, Mr. Qin started to investigate the reason for his longtime non-promotion as being caused by his race and national origin. Appx0856, 0912.

Soon after learning of Mr. Qin's investigatory activities, Vertex downgraded Mr. Qin's performance rating to a poor rating—his very first poor rating—based on one racially motivated review comment Appx0790, which resulted in Vertex taking away Mr. Qin's earned and planned promotion, Appx0282.  The outcome of Mr. Qin's long journey to being promoted—a planned promotion being taken away due to race and national origin—clearly shows that Mr. Qin worked in an environment where race and national origin determined his promotion was pervasive and regular. A reasonable person would find 14 years of non-promotion due to race and national origin to be very detrimental. The District Court's analysis failed to consider the totality of the facts and circumstances, which show Mr. Qin's work environment was hostile to a reasonable person of the same protected class as Mr. Qin.

### G.    The District Court erred in holding that Mr. Qin did not engage in protected activity for purposes of his retaliation claims.

Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 343 (3d Cir. 2006). "Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management. To determine if retaliation plaintiffs sufficiently

opposed discrimination, [courts] look to the message being conveyed rather than the means of conveyance." <u>Id</u>. The antiretaliation provision's "opposition" clause does not require the employee to initiate a complaint. <u>Crawford v. Metropolitan Gov't of Nashville and Davison Cty., Tennessee</u>, 555 U.S. 271, 277 (2009). The anti-retaliation provisions extend to retaliation for "perceived" protected activity. <u>Fogleman v. Mercy Hospital, Inc.</u>, 282 F.3d 561, 562 (3d Cir. 2002).

In the District Court's analysis of Mr. Qin's retaliation claim, it mischaracterized Mr. Qin's investigation into whether his race and national origin were the reasons for his longtime non-promotion as non-protected activities. First, the District Court reviewed two instances of Mr. Qin's investigation activities: "(1) An October 2018 meeting where Plaintiff asked his manager if his status as a Chinese man was the reason for his lack of promotion; (2) A December 13, 2018 meeting where Plaintiff reached out to Human Resources to inquire about Defendant's reporting procedures . . ." Appx0013. The District Court viewed these two instances as unrelated to Mr. Qin's investigation into race and national origin discrimination, stating, "Here, the October 2018 meeting only objectively and arguably conveyed a question around whether race had played a part in Plaintiff's lack of promotion. Similarly, the December 13, 2018 meeting only speaks to a desire to understand Defendant's reporting procedures." <u>Id</u>.

The District Court mistakenly characterized the two instances as just "a question" and "desire to understand procedures," and thus mistakenly viewed them as non-protected activities: "Taken together, Plaintiff's inquiries—across both the October 2018 and December 2018 meetings—do not seemingly rise to the level of informal complaints or protests, nor do they state opposition to unlawful discrimination in a clear and unequivocal manner that would classify them as 'protected activity.'" Appx0014.

While the first instance (where Mr. Qin asked Mr. Harter whether his race and national origin caused his lack of promotion) is indeed "a question," it was also an explicit inquiry into whether his race and national origin was causing his lack of promotion. This is more than just a simple "question," it shows Mr. Qin was investigating his race and national origin as the cause of Vertex's adverse employment actions against him, and such investigations are protected activity.

Regarding the second instance, where Mr. Qin asked Human Resources for reporting procedures, the District Court ignored the fact that Vertex had no public information about how to report discrimination activities (no contact name, no phone numbers, no emails, no formal forms, nothing). Appx0550-0642, 0822, 1282, 0989. This forced Mr. Qin (and anyone else who wanted to report discrimination) to first investigate the reporting procedures. Id. It was the only way that discrimination could be reported. Id. Therefore, Mr. Qin's inquiry about

Vertex's reporting procedures was a necessary and integral part of his investigation into his race and national origin being the reasons for his longtime non-promotion, and such investigations are protected activities. The District Court ignored the real nature of Mr. Qin's investigation and mistakenly viewed the two instances as some random events unrelated to his race and national origin. Mr. Qin's activities were protected activities.

### H.    The District Court failed to apply the "timing plus other evidence" causation test to Mr. Qin's retaliation claims.

In demonstrating causation, the Third Circuit has recognized that "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007). Temporal proximity between the protected activity and adverse employment action can be sufficient to establish a causal link. Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004). But where "the temporal proximity is not so close as to be unduly suggestive," the Third Circuit has recognized that "timing plus other evidence may be an appropriate test . . ." Id; see also Connelly v. Lane Const. Corp., 809 F.3d 780, 792-93 (3d Cir. 2016) (holding inference of causation permissible where employer "continued to rehire [plaintiff] for four years despite her complaints about co-workers, but declined to rehire her at the first such opportunity after she complained of harassment by a supervisor"; and noting that the timing – "protected

activity in May 2010," employer's layoff of plaintiff in October 2010, and employer's failure to rehire plaintiff in spring 2011 – should be assessed in light of "the seasonal character of [plaintiff's] work").

In the District Court's analysis of Mr. Qin's retaliation claim, the District Court ignored the fact that Vertex took the very first opportunity to retaliate against him for his protected activities in October 2018 and December 2018. The District Court focused solely on the approximate two-month gap between Mr. Qin's protected activities and the adverse employment actions (downgrading Mr. Qin's rating and taking away his planned promotion). The District Court ignored the fact that the negative employment actions occurred after, and within the same 2018 performance review period as, Mr. Qin's protected activities—evidence demonstrating that Vertex took the very first opportunity to take the adverse employment actions against Mr. Qin.

The District Court stated, "…The Third Circuit has also noted that, "where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test…'" Appx0012. Despite acknowledging the "timing plus other evidence" test, the District Court considered only the time duration between the protected activity and the adverse employment action: "In this case, the alleged protected activities—that preceded the low performance rating and lack of promotion—took place in

October 2018 and December 2018. Defendant made the decision not to promote Plaintiff in February 2019." Appx0014. Ignoring the surrounding circumstances, the District Court then concluded that there was no causal connection between the events: "This timeframe debunks Plaintiff's assertion that the alleged protected activities had occurred in 'close temporal proximity' to his lack of promotion." Appx0015.

The District Court's analysis of the causation element of Plaintiff's retaliation claim ignored the fact that at Vertex, the 2018 performance evaluation period ran from November 5, 2018 through February 8, 2019 when all employees' performance ratings and other related decisions (such as promotions) would be determined. Appx1158-1159. In the months after that, the decisions would be executed (such as salary adjustments, PIP, promotion actions, etc.). Id. The timeline of Mr. Qin's performance evaluation followed Vertex's performance review policy and thus naturally spanned several months. Id. The District Court ignored the circumstances surrounding the timeline of events: both the protected activities and the adverse employment actions (downgrading Mr. Qin's performance rating and taking away his planned promotion) were all within the same 2018 performance review period. The District Court failed to appreciate the fact that Vertex jumped at the very first opportunity, immediately within the same ongoing performance evaluation, to punish Mr. Qin for his protected activities.

Additionally, in analyzing the time between the two, the District Court failed to consider the fact that the 2018 holiday season was in between, when Vertex's business activities slowed down considerably. Appx1158-1159.

Furthermore, in its analysis of Mr. Qin's retaliation claim, the District Court ignored the fact that there were only two days between Mr. Qin's protected activity on March 31, 2019 and Vertex's decision to place Mr. Qin on a PIP on April 2, 2019. Appx1122-1124, 1286. The District Court ignored the fact that the PIP was the starting point on the path toward Mr. Qin's termination on May 16, 2019. Appx0787, 0976.

The District Court stated, "Relatedly, the remaining alleged protected activity—sending an email to HR complaining about stereotypical language in Plaintiff's performance review—took place on March 31, 2019. Defendant terminated Plaintiff on May 16, 2019. This timeframe debunks Plaintiff's assertion that the alleged protected activities had occurred in 'close temporal proximity' to his lack of a promotion and ultimate termination." Appx0014. The District Court reached its conclusion based on the two-month time duration between the protected activity on March 31, 2019 and Mr. Qin's termination, instead of Vertex's first negative employment action of placing Mr. Qin on a PIP.  Appx0015 ("Another approximately two months had elapsed between Plaintiff's March 31, 2019 email and his May 26, 2019 termination."). It should be noted that the District Court also

made a mistake about Mr. Qin's termination date, which was May 16, 2019, not May 26, 2019. The fact is, after Mr. Qin's March 31, 2019 email complaint, the very first negative employment action that Vertex took against him was to place him on a PIP on April 2, 2019, just two days after his complaint. Mr. Qin's termination was the ultimate outcome of this negative employment action. Thus, the close temporal proximity and the surrounding circumstances satisfy the causation element of Mr. Qin's retaliation claim.

## VII.   CONCLUSION

For the foregoing reasons, the District Court erred in granting summary judgment to Defendant on Plaintiff's discrimination, hostile work environment and retaliation claims.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

*/s/ Ian M. Bryson, Esquire*
IAN M. BRYSON, ESQUIRE
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(267) 857-0849
ian@dereksmithlaw.com
Dated: June 26, 2023          *Attorneys for Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

I, Ian M. Bryson, Esquire, certify as follows:

      1.     I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

      2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

*/s/ Ian M. Bryson, Esquire*

Dated: June 26, 2023          IAN M. BRYSON, ESQUIRE

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 8,789 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2010 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Avast Free Antivirus Protection, version 21.9.1494 has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Ian M. Bryson, Esquire*
IAN M. BRYSON, ESQUIRE

Dated: <u>June 26, 2023</u>

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I, Ian M. Bryson, Esquire, hereby certify pursuant to Fed. R. App. P. 25(d) that, on June 26, 2023, the foregoing Brief and Appendix Volumes I - IV for Plaintiff- Appellant was filed through the CM/ECF system and served electronically.

Unless otherwise noted, seven copies will be filed with the Court within the time provided in the Court's rules via Express Mail.

*/s/ Ian M. Bryson, Esquire*
IAN M. BRYSON, ESQUIRE

Dated: <u>June 26, 2023</u>

**APPENDIX OF PLAINTIFF/APPELLANT**
**TABLE OF CONTENTS**

**VOLUME I**
**(Appended to Brief)**

District Court Opinion Dated October 18, 2022 Granting Summary Judgment…………………………………………………………………………Appx0001

District Court Order Dated October 18, 2022 Granting Summary Judgment………………………………………………………………………Appx0018

District Court Order Dated December 12, 2022 Denying Motion for Reconsideration……………………………………………………..……Appx0019

Notice of Appeal…………………………...……………………………..Appx0020

**VOLUME II**

Docket Entries……………………………………………………..………....Appx0025

Plaintiff's Amended Complaint.................................................................Appx0032

Defendant's Answer to Plaintiff's Amended Complaint...........................Appx0062

Defendant's Statement of Undisputed Material Facts for Summary Judgment...................................................................................................Appx0081

Defendant's Exhibits to Motion for Summary Judgment..........................Appx0110

**VOLUME III**

Defendant's Remaining Exhibits to Motion for Summary Judgment........Appx0660

Plaintiff's Response to Defendant's Statement of Undisputed Material Facts for Summary Judgment.......................................................................................Appx0726

Plaintiff's Statement of Additional Facts That Preclude Summary
Judgment....................................................................................Appx0769

**VOLUME IV**

Plaintiff's Exhibits to Response in Opposition to Motion for Summary
Judgment....................................................................................Appx0781

Defendant's Response to Plaintiff's Statement of Additional Disputed Material
Facts.........................................................................................Appx1308

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QING QIN, | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 20-2423-JMY** |
| | : | |
| VERTEX, INC., | : | |
| Defendant. | : | |

## MEMORANDUM

**Younge, J.**                                                           **October 18, 2022**

### I.      INTRODUCTION

Currently before this Court is Defendant Vertex, Inc.'s ("Vertex") Motion for Summary

Judgment (ECF No. 28). The Court finds this motion appropriate for resolution without oral

argument. Fed. R. Civ. P. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, Defendant

Vertex's Motion for Summary Judgment (ECF No. 28) will be granted.

### II.      FACTUAL BACKGROUND

Plaintiff Qing Qin has initiated this civil action against his former employer, Defendant

Vertex, a software company that develops and sells corporate tax technology.  He has alleged

discrimination based on his national origin (Chinese) and race (Asian). (Am. Compl. ¶¶ 2, 12, ECF

No. 10.)  In October 2000, Plaintiff was hired as an entry-level Architect. (Am. Compl. ¶ 22, ECF

No. 10.)   For context, Defendant's software architects were distributed across three seniority

levels: (1) entry-level Architect; (2) Senior Architect; and (3) Principal Architect. (Am. Compl. ¶

23, ECF No. 10.)  After working for Defendant for over 18 years, Plaintiff asked his manager—

Richard Harter—whether Plaintiff's Chinese nationality had anything to do with Plaintiff not being

promoted to Senior Architect during his tenure with the company. (Am. Compl. ¶ 52, ECF No.

10.)  Plaintiff's manager said "no."  Plaintiff alleges, however, that after posing that question in or

Appx0001

around October 2018, he was given his first low performance rating ("Usually Meets Expectations") in February 2019 instead of his normal ("Strong Contributor") rating. (Am. Compl. ¶ 54, ECF No. 10.) Plaintiff would later learn from John Hart, one of his coworkers and reviewers, that Hart's negative review of Plaintiff had been due to Plaintiff's "cultural differences." (Am. Compl. ¶ 59, ECF No. 10.) Shortly thereafter, in March 2019, Defendant gave Plaintiff the option to either undertake a Performance Improvement Plan ("PIP") or accept termination with a severance package—comprised of 26 weeks' pay and benefits. (Am. Compl. ¶ 60, ECF No. 10.) On April 2, 2019, Plaintiff selected the PIP option; however, on May 16, 2019, Plaintiff was terminated due to Plaintiff's alleged unsuccessful completion of the PIP. (Am. Compl. ¶¶ 60-71, ECF No. 10.)

In addition to the "cultural differences" comment made by one of Plaintiff's coworkers and reviewers, Plaintiff also alleges additional instances of problematic behavior. For example, in or around 2016, Plaintiff had suggested that Defendant use a breakthrough technology that had originated in China—to which one of his coworkers within the Chief Tax Office ("CTO")— Bob Norton—responded: "Why don't you go back to China if the technology is so advanced?" (Am. Compl. ¶¶ 42-44, ECF No. 10.) On other occasions, Plaintiff noted that coworkers—whom Plaintiff never identified by name—would call him "China Man." (Pl. Statement of Additional Disputed Material Facts (hereinafter, "SAF"), ¶¶ 35-36, ECF No. 35-2.) In connection with these events and interactions, Plaintiff brings claims for disparate treatment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) *et seq.*, Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act of 1955 ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*[1] In

---

[1] At this summary judgment stage, Plaintiff "concede[d] to dismissal of his aiding and abetting claim under the PHRA." (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 53, ECF No. 35.)

response, Defendant has filed a motion for summary judgment seeking to dismiss all of Plaintiff's claims. (Def. Mot. for Summ. J., ECF No. 28.)

### III.  LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case."  *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

Appx0003

In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

As an initial matter, it is worth noting that Plaintiff's claims across Title VII, Section 1981, and the PHRA can be consolidated for purposes of this analysis. *See Harley v. McCoach*, 928 F. Supp. 533, 538 (E.D. Pa. 1996) ("[Plaintiff's] Title VII, PHRA, and § 1981 claims all fall under the same analytical framework, and will therefore be examined together.") Thus, this Court will review Plaintiff's consolidated disparate treatment, hostile work environment, and retaliation claims in turn.

### a. **Disparate Treatment**

As the Third Circuit instructs, "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990). Under a disparate treatment theory, "proof of the employer's discriminatory motive is critical." *Id.* Further, there are two ways to show discriminatory intent: either through (1) direct evidence; or (2) indirect and circumstantial evidence. *Id.*

#### i. **Direct Evidence**

Direct evidence of discrimination is evidence that "*is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case* [as is necessary in a

4

Appx0004

pretext action] to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995) (emphasis in original) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994)). In proffering direct evidence of discrimination, Plaintiff alleges that he had been called "China Man" on a number of different occasions and that Bob Norton had asked him, "Why don't you go back to China if the technology is so advanced?" (SAF, ¶¶ 35-36, ECF No. 35-2.; Am. Compl. ¶¶ 42-44, ECF No. 10.) Additionally, another coworker—John Hart—had informed Plaintiff that Hart's negative review of Plaintiff had been due to Plaintiff's "cultural differences." (Am. Compl. ¶ 59, ECF No. 10.) Taken together, Plaintiff claims that his coworkers' discriminatory remarks are direct evidence of discrimination and that key decisionmakers had sought to remove Plaintiff after discovering that he had been questioning whether his race or national origin played a part in his poor performance rating and lack of a promotion. (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., pp. 10-11, ECF No. 35.)

Despite these examples, Plaintiff has failed to show direct evidence of discrimination. First, the comments of the individuals making the alleged discriminatory remarks—Bob Norton ("go back to China"), John Hart ("cultural differences"), and unidentified individuals (calling Plaintiff "China Man")—each amount to what are considered "stray remarks [that] are not direct evidence of discrimination." *Kim-Foraker v. Allstate Ins. Co.*, 834 F. Supp. 2d 267, 277 (E.D. Pa. 2011). Further, the comments were made by coworkers, and not decisionmakers. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J.) (concurring) ("Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard…What is required is…direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision."). Additionally, the content of the alleged remarks do not rise to the level of direct evidence of discrimination. In *Kim-Foraker*, the supervisor stated to the plaintiff, a

Korean-American, that the supervisor "was taking kung fu; that Koreans always use cash; and that Koreans always work hard, so expectations for [the plaintiff] were greater than those for other employees." *Kim-Foraker,* 834 F. Supp. 2d at 277. The United States District Court for the Eastern District of Pennsylvania (the "Eastern District") held that "the remarks do not amount to direct evidence of discrimination"—especially since "none of the remarks were uttered when [the defendant] took disciplinary action against [the plaintiff] or made the decision to terminate [the plaintiff's] employment." *Id.* Thus, if such overt and direct comments made by an actual supervisor—not acting in a decisional capacity—do not rise to the level of direct evidence of discrimination, then similar stray remarks made by non-decisionmakers—in this case—also cannot satisfy a direct evidence theory of discrimination.

## ii. Indirect or Circumstantial Evidence

Under the pretext (also referred to as the indirect or circumstantial evidence) theory, the Third Circuit instructs that the U.S. Supreme Court's *McDonnell Douglas* burden-shifting framework applies. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). The *McDonnell Douglas* burden-shifting framework has three potential steps. First, "the plaintiff must…establish a prima facie case of discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Id.* Second, if the plaintiff makes such a showing of a *prima facie* case, "then an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* Third and finally, if the defendant provides a legitimate, non-discriminatory reason, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is

merely pretext for intentional discrimination." *Id.* The U.S. Supreme Court reiterated that "[t]he prima facie case under *McDonnell Douglas*, however, is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). Further, "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Id.* at 512 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Turning to the first step of the *McDonnell Douglas* burden-shifting framework, Plaintiff and Defendant seemingly agree that the first three prongs of a *prima facie* Title VII discrimination case are satisfied and, instead, spend the bulk of their time and energy arguing over the fourth prong—*i.e.,* whether the lack of promotion and ultimate termination give rise to an inference of discrimination. (Mem. of Law in Support of Def. Mot. to Dismiss, pp. 20-21, ECF No. 28-1.; Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 11, ECF No. 35.) Relevant to this analysis, the fourth prong is interpreted differently under a Title VII failure to promote claim and a Title VII termination claim. Under a failure to promote claim, Plaintiff can establish an inference of discrimination "by showing that the position to which she applied and was rejected either: (1) remained open after her rejection and the employer continued to seek applicants with the plaintiff's qualifications; or (2) was filled by someone else who was chosen over the plaintiff." *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 353 (E.D. Pa. 2013) (referencing *Bray v. Marriott Hotels*, 110 F.3d 986, 990 n.5 (3d Cir. 1997)). In this case, there has been no evidence that Defendant sought applicants for the Senior Architect position, nor did Defendant select another candidate over Plaintiff. Under a Title VII termination claim, Plaintiff can establish such an inference of discrimination by "demonstrat[ing] that similarly-situated persons outside the protected class were treated more favorably." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 589 (E.D. Pa.), *aff'd,* 708 F. App'x 48 (3d Cir. 2017). To be "similarly situated,"

7

relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). Here, again, Plaintiff has failed to provide evidence which would allow this Court to infer discrimination. Thus, this Court cannot infer that a discriminatory motive had tainted or adversely impacted Defendant's decision not to promote Plaintiff and to ultimately terminate Plaintiff.

Even if Plaintiff had made out a *prima facie* case, Defendant has offered legitimate, non-discriminatory reasons for not promoting Plaintiff and for terminating his employment. As the Eastern District notes, "[t]he defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons." *Collins*, 247 F. Supp. 3d at 590 (quoting *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 461 (E.D. Pa. 2013)). With respect to the failure to promote claim, Defendant alleges that Plaintiff failed to engage in formalized Vertex initiatives and projects (as instructed by Plaintiff's manager) and, instead, spent most of the year—between August 27, 2018 and March 29, 2019—submitting eleven ideas to Defendant's "idea box," none of which were adopted by Defendant. (Def. Mot. for Summ. J., pp. 20-21, ECF No. 28.) With respect to the termination claim, Defendant asserts that Plaintiff had been terminated for failing to satisfactorily complete his PIP. (Def. Mot. for Summ. J., p. 28, ECF No. 28.) Given these legitimate, non-discriminatory reasons proffered by Defendant, the burden then shifts back to Plaintiff to show that these reasons are merely a pretext for intentional discrimination.

Turning to the third and final step of the *McDonnell Douglas* burden-shifting framework, the Third Circuit describes how Plaintiff "must point to some evidence, direct or circumstantial,

Appx0008

from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  To establish pretext under the first *Fuentes* prong, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (citations omitted). To establish pretext under the second *Fuentes* prong, the plaintiff could show, for example, "that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of person." *Id.*  While the Third Circuit recognizes that "this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

In this case, Plaintiff has not proffered sufficient evidence of pretextual discrimination across both his failure to promote and termination claims. With respect to both claims, Defendant's non-discriminatory reasons for not promoting Plaintiff—*i.e.,* not focusing on or being fully engaged in formal Vertex projects and not successfully completing the PIP—have been both consistent and plausible.  In fact, even as this Court must view all inferences in a light most favorable to Plaintiff, it is noteworthy that, on May 6, 2019, Plaintiff stated: "Since my pip was extended for two weeks, I put some thoughts on how to seek better outcome than the past 5 weeks,

which admittedly had not been effective." (Pl. Resp. to Def. Statement of Undisputed Material Facts, ¶ 123, ECF No. 35-1.)  However, despite this admission from Plaintiff regarding his own ineffectiveness throughout the PIP, this Court reiterates the pronouncement made by the Eastern District on several different occasions: "so long as Defendant's investigation and determination was based on a reasonable good faith belief, the Court may not act as a super-personnel department over an employer's business judgment." *Ade v. KidsPeace Corp.*, 698 F. Supp. 2d 501, 517 (E.D. Pa.), *aff'd,* 401 F. App'x 697 (3d Cir. 2010) (quoting *Jackson v. Bob Evans - Columbus*, No. 2:04CV559, 2006 WL 3814099, at *8 (W.D. Pa. Dec. 22, 2006)).  Relatedly, under the second prong of *Fuentes* and as described above, Plaintiff has failed to proffer evidence—outside of non-actionable stray remarks from non-decisionmakers and coworkers—that he had been subjected to unlawful discriminatory treatment by Defendant, and Plaintiff also has not shown that other, similarly-situated non-Chinese employees were treated more favorably or that other Chinese employees or other members of a protected class were discriminated against by Defendant.

Taken together, Counts I, IV, and VII are dismissed—as a reasonable jury could not infer that Defendant is liable for discrimination and disparate treatment under Title VII, Section 1981, and the PHRA.

> **b.  Hostile Work Environment**

This Court next reviews Plaintiff's hostile work environment claim.  To make out a *prima facie* case, Plaintiff must show that: "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)).  When assessing whether

an environment is hostile or abusive, the Third Circuit reiterates the importance of considering the "totality of the circumstances" and "concentrat[ing] not on individual incidents, but on the overall scenario." *Id.* at 262–63 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). In conducting this analysis, the U.S. Supreme instructs courts to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 263 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). However, "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* at 262 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

In this case, Plaintiff's showing of a hostile work environment stem in part from the three comments made by his coworkers—Bob Norton ("why don't you go back to China if the technology is so advanced?"), John Hart ("cultural differences" informed feedback in performance review), and other unidentified individuals (calling Plaintiff "China Man" over the years)—and comments made in his performance review that were based on stereotypical tropes and generalizations of Plaintiff as a Chinese man. (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., pp. 51-52, ECF No. 35.) As previously described, these offhanded and isolated comments are not sufficient to establish a hostile work environment claim. In fact, the Eastern District held in a similar action that "[t]he three arguably race-based incidents or comments in the summary judgment record, taken together, fail to establish a severe or pervasive hostile work environment attributable to Defendant." *Hunter v. Trustees of Univ. of Pennsylvania*, No. CV 20-2334, 2021 WL 1424710, at *8 (E.D. Pa. Apr. 15, 2021). In that case, one comment included a critique of the plaintiff's demeanor that relied on a racial trope about angry Black women. *Id.* Another comment involved calling the plaintiff "low," "low down dirty," and "nothing." *Id.* The Eastern District

11

concluded that "[a] reasonable jury could not conclude from two isolated incidents involving racial stereotypes, two years apart, and only one of which is attributable to a supervisory employee, that Plaintiff was subjected to a racially hostile work environment." *Id.* Relatedly, the Eastern District has not been keen on crediting or classifying facially neutral comments as direct evidence of a hostile work environment. *See, e.g., Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 546 (E.D. Pa. 2013) ("Plaintiffs admit there is no direct evidence of hostile comments based on their race or ethnicity, and instead rely on only a handful of underwhelming, facially neutral incidents to purport a hostile work environment."). In sum, Plaintiff's assertion of isolated comments about his national origin and race and alleged indirect tropes, stereotypes, and generalizations within his performance review—none of which came from a supervisory employee—similarly could not lead a reasonable jury to conclude that Plaintiff had been subject to a hostile work environment.

Taken together, Counts II and V are dismissed—as a reasonable jury could not infer that Defendant is liable for creating a hostile work environment under Title VII and Section 1981.

### c. **Retaliation**

Finally, this Court reviews Plaintiff's retaliation claim. To establish a *prima facie* case, Plaintiff must show that: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). In this case, Plaintiff points to three instances of protected activity that are connected to Defendant's retaliatory actions in failing to promote Plaintiff and ultimately terminating Plaintiff:

(1) An **October 2018** meeting where Plaintiff asked his manager if his status as a Chinese man was the reason for his lack of promotion;

(2) A **December 13, 2018** meeting where Plaintiff reached out to Human Resources to inquire about Defendant's reporting procedures; and

(3) A **March 31, 2019** email where Plaintiff stated that his performance review included stereotypical generalizations that were baseless and false.

(Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., pp. 38-39, ECF No. 35.) In this case, Plaintiff has difficulty satisfying the first and third prongs.

Under the first prong, the Third Circuit instructs that "[o]nly complaints about discrimination prohibited by Title VII—that is, discrimination on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e–2—constitute "protected activity'…General complaints of unfair treatment will not suffice." *Davis v. City of Newark*, 417 F. App'x 201, 203 (3d Cir. 2011). Further, "[i]t is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative [in assessing whether the plaintiff engaged in protected conduct]." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006). Additionally, protected activity or conduct can include "informal protests of discriminatory employment practices, including making complaints to management." *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (referencing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). However, "[a]lthough informal complaints may suffice, 'the employee's 'opposition' to unlawful discrimination must not be equivocal [or vague].'" *Perry v. Harvey*, 332 F. App'x 728, 733 (3d Cir. 2009) (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 341–43 (3d Cir. 2006), *as amended* (Sept. 13, 2006)).

Here, the October 2018 meeting only objectively and arguably conveyed a question around whether race had played a part in Plaintiff's lack of promotion. Similarly, the December 13, 2018 meeting only speaks to a desire to understand Defendant's reporting procedures. While the Third Circuit has held that retaliatory action can result from an employer's *perception* that an employee is engaging in protected activity, *see Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 572 (3d Cir.

13

2002), Andrea Falco—Defendant's Employee Relations Advisor—only stated that Plaintiff "was either holding out on me with some information or that he had witnessed something in another area of the business or with a colleague." (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., p. 39, ECF No. 35.)  Even this statement does not suggest that an informal complaint had been filed or that such a complaint had directly involved Plaintiff—ultimately making retaliatory motive that much harder to pinpoint in this instance. Taken together, Plaintiff's inquiries—across both the October 2018 and December 2018 meetings—do not seemingly rise to the level of informal complaints or protests, nor do they state opposition to unlawful discrimination in a clear and unequivocal manner that would classify them as "protected activity."  However, even if all three instances could constitute "protected activity," Plaintiff still has not satisfied the third prong—by failing to show a causal connection between the purported protected activity and the alleged retaliation in the form of a lack of a promotion and ultimately being terminated.

In his Amended Complaint, Plaintiff asserts a "close temporal proximity" between his complaint about discrimination and his lack of a promotion and subsequent termination. (Am. Compl. ¶¶ 54, 75, ECF No. 10.) Under the third prong, the "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)). Though "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Id.* (quoting *Shellenberger,* 318 F.3d at 189 n.9).  The Third Circuit has also noted that, "where 'the temporal proximity is not so close as to be unduly suggestive,' we have recognized that 'timing plus other evidence may be an appropriate test....'" *Id.* (quoting *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)).  For context, the Third Circuit has found that two days between protected activity and termination was sufficient on make out a retaliatory discharge

claim. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ("[The plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [the defendant's] receipt of notice of [the plaintiff's] EEOC claim."). On the other hand, the Third Circuit held that a three-week gap between the protected activity and the termination (along with an assessment of the record as a whole) had not been enough to demonstrate an unusually suggestive temporal proximity. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). Similarly, the Eastern District determined that a two-month gap between the protected activity and the termination was not proximate enough to suggest an unusually suggestive temporal proximity. *See Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 602–03 (E.D. Pa.), *aff'd*, 708 F. App'x 48 (3d Cir. 2017) ("Plaintiff's January 20, 2012…complaint is not sufficiently proximate to her March 20, 2012 termination to suggest a causal link by temporal proximity.").

In this case, the alleged protected activities—that preceded the low performance rating and lack of promotion—took place in October 2018 and December 2018. Defendant made the decision not to promote Plaintiff in February 2019. (Pl. Mem. of Law in Opp. to Def. Mot. for Summ. J., pp. 38-40, ECF No. 35.) Relatedly, the remaining alleged protected activity—sending an email to HR complaining about stereotypical language in Plaintiff's performance review—took place on March 31, 2019. Defendant terminated Plaintiff on May 16, 2019. This timeframe debunks Plaintiff's assertion that the alleged protected activities had occurred in "close temporal proximity" to his lack of a promotion and ultimate termination. Quite the contrary, between two and four months had elapsed between Plaintiff's October 2018 and December 2018 protected activities and his February 2019 denial of promotion. Another approximately two months had elapsed between Plaintiff's March 31, 2019 email and his May 26, 2019 termination. In accord with the Third Circuit's unwillingness—in *Thomas*—to infer a causal connection between a three-week gap

between protected activity and the plaintiff's termination and the Eastern District's unwillingness—in *Collins*—to infer a causal connection between a two-month gap between protected activity and the plaintiff's termination, this Court, similarly, refuses to find a causal connection between the two-to-fourth-month gap that exists between Plaintiff's alleged protected activities and Plaintiff's lack of a promotion and subsequent termination.

Thus, Plaintiff is unable to make out a *prima facie* retaliation claim. Given this Court's determination that a *prima facie* retaliation claim has not been made by Plaintiff, this Court declines to engage in the *McDonnell Douglas* burden-shifting framework—which also applies to retaliation claims, *see Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006)—for the same reasons stated in the above pretext analysis, *supra* Section (a). As previously discussed, Defendant has proffered a plausible and consistent explanation for both the lack of promotion and the subsequent termination—making it that much harder to uncover any additional evidence within the summary judgment record that would indicate or suggest a discriminatory animus or motive. Stated another way, this Court's inability to find evidence of pretext when analyzing the discrimination claim naturally compels this Court to similarly find a lack of pretext with respect to this retaliation claim.

Taken together, Counts III, VI, and VIII are dismissed—as a reasonable jury could not infer that Defendant is liable for retaliation under Title VII, Section 1981, and the PHRA.

## V. CONCLUSION

For the foregoing reasons, Defendant Vertex's motion for summary judgment is hereby granted.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

_/s/ John Milton Younge_
**JUDGE JOHN MILTON YOUNGE**

Appx0017

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **QING QIN,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-2423-JMY** |
| | : | |
| **VERTEX, INC.,** | : | |
| Defendant. | : | |

## ORDER

**AND NOW**, this 18th day of October, 2022, upon consideration of Defendant Vertex, Inc.'s ("Vertex") Motion for Summary Judgment (ECF No. 28), all papers filed in support thereof and in opposition thereto, and for the reasons set forth in the accompanying Memorandum filed by the Court, it is hereby **ORDERED** that Defendant's motion is **GRANTED**.

**THIS ACTION IS DISMISSED WITH PREJUDICE.** The Clerk of Court shall mark this matter **CLOSED**.

**IT IS SO ORDERED.**

BY THE COURT:

_/s/ John Milton Younge_
**JUDGE JOHN MILTON YOUNGE**

Appx0018

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **QING QIN,** | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 20-2423-JMY** |
| | : | |
| **VERTEX, INC.,** | : | |
| Defendant. | : | |

## ORDER

**AND NOW**, this 12th day of December, 2022, upon consideration of Plaintiff Qing Qin's Motion for Reconsideration (ECF No. 46) of this Court's Memorandum (ECF No. 44) and Order (ECF No. 45) granting Defendant Vertex, Inc.'s Motion for Summary Judgment (ECF No. 28), all papers filed in support thereof and in opposition thereto, it is hereby **ORDERED** that Plaintiff's Motion for Reconsideration (ECF No. 46) is **DENIED**.

Pursuant to this Court's October 18, 2022 Order (ECF No. 45), **THIS ACTION IS DISMISSED WITH PREJUDICE.** The Clerk of Court shall mark this matter **CLOSED**.

**IT IS SO ORDERED.**

BY THE COURT:

_/s/ John Milton Younge_
**JUDGE JOHN MILTON YOUNGE**

Appx0019

**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiff Qing Qin*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| QING QIN,<br><br>                    Plaintiff,<br><br>          v.<br><br>VERTEX, INC.,<br><br>                    Defendant. | Civil Action No. 2:20-cv-02423 |

## <u>NOTICE OF APPEAL</u>

To the Clerk of Court and All Parties of Record:

NOTICE IS HEREBY GIVEN that Qing Qin hereby appeals to the United States Court

of Appeals for the Third Circuit from the final judgment entered on all Counts in this action on

December 12, 2022. (ECF No. 49 attached hereto as Exhibit A.)

**DEREK SMITH LAW GROUP, PLLC**

*/s/ Ian M. Bryson, Esquire*
IAN M. BRYSON, ESQ.
Dated: <u>January 5, 2023</u>          *Attorneys for Plaintiff, Qing Qin*

Appx0020

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QING QIN, | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| | : | |
| v. | : | **NO. 20-2423-JMY** |
| | : | |
| VERTEX, INC., | : | |
| Defendant. | : | |

## ORDER

**AND NOW**, this 12th day of December, 2022, upon consideration of Plaintiff Qing Qin's Motion for Reconsideration (ECF No. 46) of this Court's Memorandum (ECF No. 44) and Order (ECF No. 45) granting Defendant Vertex, Inc.'s Motion for Summary Judgment (ECF No. 28), all papers filed in support thereof and in opposition thereto, it is hereby **ORDERED** that Plaintiff's Motion for Reconsideration (ECF No. 46) is **DENIED**.

Pursuant to this Court's October 18, 2022 Order (ECF No. 45), **THIS ACTION IS DISMISSED WITH PREJUDICE.** The Clerk of Court shall mark this matter **CLOSED**.

**IT IS SO ORDERED.**

BY THE COURT:

_____/s/ John Milton Younge_____
**JUDGE JOHN MILTON YOUNGE**

Appx0022

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QING QIN, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 20-2423-JMY |
| | : | |
| VERTEX, INC., | : | |
| Defendant. | : | |

## ORDER

**AND NOW**, this 18th day of October, 2022, upon consideration of Defendant Vertex, Inc.'s ("Vertex") Motion for Summary Judgment (ECF No. 28), all papers filed in support thereof and in opposition thereto, and for the reasons set forth in the accompanying Memorandum filed by the Court, it is hereby **ORDERED** that Defendant's motion is **GRANTED**.

**THIS ACTION IS DISMISSED WITH PREJUDICE.** The Clerk of Court shall mark this matter **CLOSED**.

**IT IS SO ORDERED.**

BY THE COURT:

_/s/ John Milton Younge_
**JUDGE JOHN MILTON YOUNGE**

**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiff Qing Qin*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| QING QIN,<br><br>                    Plaintiff,<br><br>    v.<br><br>VERTEX, INC.,<br><br>                  Defendant. | Civil Action No. 2:20-cv-02423<br><br>**Certificate of Service** |

I, Ian M. Bryson, Esq. hereby certify that on this date, I filed the foregoing Notice of

Appeal on ECF, through which these documents are available for available for viewing and

downloading and caused to be served upon all counsel of record.

                                       */s/ Ian M. Bryson, Esquire*
                                       Ian M. Bryson, Esquire
Dated: <u>January 5, 2023</u>              *Attorneys for Qing Qin*

Appx0024