**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

**NO. 23-1031**

---

**QING QIN**

**Plaintiff/Appellant,**

**v.**

**VERTEX, INC.**

**Defendant/Appellee.**

---

**REPLY BRIEF FOR PLAINTIFF-APPELLANT**

---

**An Appeal from the Order of Judgment entered**
**in the United States District Court**
**for the Eastern District of Pennsylvania**
**on December 12th, 2022 at Civil Action No. 2:20-cv-02423**

---

Ian M. Bryson, Esq.
Derek Smith Law Group, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(267) 857-0849
ian@dereksmithlaw.com
Attorneys for Appellant

# **TABLE OF CONTENTS**

ARGUMENT.................................................................................................1

A.  The District Court Erred in Granting Summary Judgment Because
The Alleged Conduct Created A Hostile Work Environment...............1

B.  The Court Should Reverse The District Court's Order Because There
Is Direct Evidence of Discrimination.....................................................3

C.  The District Court's Order Should Be Reversed Because There Is
Sufficient Evidence Supporting A Prima Facie Case Of
Discrimination........................................................................................5

  1.  There Is Evidence Vertex Denied Mr. Qin's Promotion Because
He Is Chinese................................................................................5

  2.  Mr. Qin Has Pointed To Concrete Evidence To Prove Vertex
Terminated Him Because He Is Chinese.....................................6

D.  The Court Should Reverse The District Court's Order Because There
Is Ample Evidence Proving Pretext.......................................................7

E.  The Court Should Reverse The District Court's Order On
Retaliation............................................................................................11

  1.  Mr. Qin Did Not Waive Any Challenge To The Issue Of Pretext
For The Retaliation Claim..........................................................11

  2.  Mr. Qin's Questions Are Protected Activity..............................12

  3.  Mr. Qin's Complaints Are Causally Related To Vertex's
Adverse Actions.........................................................................13

  4.  Mr. Qin's March 31, 2019 Email Supports His Retaliation
Claim...........................................................................................16

  5.  The Court Should Reverse The District Court's Order Because
There Is Evidence Showing Pretext For
Retaliation..................................................................................21

CONCLUSION.................................................................................................21

Plaintiff-Appellant submits this Reply to the Brief of Defendant-Appellee, Vertex, Inc. At trial, Vertex will be free to argue that the jury should disregard the evidence that contradicts Vertex's arguments. But here, on a review of summary judgment, this Court must consider all the evidence viewed in the light most favorable to Mr. Qin. When properly construed, the record shows countless disputes of material fact that should have precluded the District Court from granting summary judgment to Vertex. The District Court's summary judgment decision should therefore be vacated.

## Argument

### A.    The District Court Erred in Granting Summary Judgment Because The Alleged Conduct Created A Hostile Work Environment

Vertex argues that its conduct of keeping Mr. Qin in an entry level position over more than fourteen years should not be considered in the Court's hostile work environment analysis construing it as "fourteen years of promotion denials" rather than one continuous act. The fact is that Mr. Qin had never received any written or formal communication that either approved or denied his promotion application, Appx0036, 0771, which started in or around 2005, Appx1090, 0771. Mr. Qin's promotion application over about fourteen years was one single continuous action because Mr. Qin never received a denial to his promotion application before 2019, when his planned promotion was taken away because he was given a poor

performance rating. Appx0282. The poor rating was given by Mr. Rick Harter and the Calibration Team based on the sole negative, racially-motivated, review comment by Mr. John Hart. Appx0709-0712. Then it became clear that Mr. Qin's longtime non-promotion was because of his race and national origin.

Vertex's hostile work environment argument also ignores the fact that it effectively prohibits employees from filing discrimination complaints. Vertex did not provide employees with specific information about how to file a discrimination complaint (there was no phone number to call, no name to report to, no email addresses, no forms to fill in, etc.). Appx0550-0642. Therefore an employee who wanted to file a discrimination complaint would be forced to ask for details about the reporting procedures, thereby tipping off the company's management to punish the employee—e.g., by giving him a poor performance rating and pushing him out—which is exactly what happened to Mr. Qin. After Vertex learned that Mr. Qin was investigating whether his race and national origin were the reason for his longtime non-promotion, Appx0475-0476, and that Mr. Qin was asking for discrimination reporting procedures, Appx0648, Vertex immediately downgraded his performance rating and ultimately terminated him at the end of the performance review period, Appx0787, 0976.

A reasonable jury would find Vertex's work environment to be severe and pervasive because it allowed a 14-year non-promotion based on race and national

origin, and it effectively prohibited an employee from filing discrimination complaints. For these reasons and the reasons outlined in Mr. Qin's opening brief, the summary judgment decision should be reversed.

### B.    The Court Should Reverse the District Court's Order Because There is Direct Evidence of Discrimination

Vertex argument that there is no direct evidence of discrimination hinges on its misinterpretation of the term "cultural differences." Taking the comment out of context, Vertex asserts that the comment refers to the culture of Vertex, not Mr. Qin's Chinese culture. Vertex is wrong; the term is discriminatory on its face for the following reasons:

1. Mr. Hart made the comment to Mr. Qin in response to Mr. Qin questions about the negative performance review, which was full of stereotypical generalizations of a Chinese person without any factual basis. Mr. Qin replied that it was due to "cultural differences." Appx.0823, 1128-1129, 1145-1146. The conversation had nothing to do with Vertex culture.

2. The phrases used in Mr. Hart's comment on Mr. Qin's performance review are simply not about Vertex culture. Appx0709-0712. For example, phrases such as "general passivity," "semi-hiding for years," and "uncomfortably laughs and physically recoils" are not about Vertex culture, they are Chinese stereotypes.

3. Vertex's own investigation into Mr. Hart's review concluded that the language of the review "was viewed as discriminatory," and that it was "not appropriate." Appx0652. If the comment were about Vertex culture, then it would not be discriminatory or inappropriate.

In short, Mr. Hart's performance review has nothing to do with Mr. Qin's work performance, it was motivated by race and national origin. Mr. Hart admitted it and Vertex's investigation agreed.

Vertex also states that "Mr. Hart was not a decisionmaker" in an attempt to mislead the Court to believe that Mr. Qin's poor performance rating and termination were unrelated to Mr. Hart's racially motivated comment. Vertex ignores the fact that Mr. Hart's review was part of the official record of Mr. Qin's 2018 performance review. The very purpose of each reviewer's comment (including Mr. Hart's) was to provide a basis and justification for Vertex's final performance rating for the employee and any decisions that followed (i.e., performance improvement plan and/or termination). Vertex decisionmakers gave Mr. Qin a poor rating based solely on the racially motivated review comment of Mr. Hart, which was the only negative comment on Mr. Qin's 2018 performance review.

Vertex further asserted that "Ms. Kurtz denied the promotion after Mr. Harter approved it," in attempt to mislead the Court to think that the denial of Mr. Qin's

promotion was unrelated to Mr. Hart's racially motivated comment. Here, Vertex is wrong again. There is no evidence that Ms. Kurtz denied Mr. Qin's promotion. In fact, Ms. Kurtz stated that the promotion was taken away as a result of Mr. Qin's poor performance rating. Appx.0282. The fact is that Mr. Qin's promotion denial was caused by the poor rating which was based on Mr. Hart's racially motivated review. Therefore, Mr. Qin's promotion denial was caused by Mr. Hart's racially motivated review.

In sum, Mr. Hart's racially motivated comment is the direct evidence that Vertex based it decisions (to give Mr. Qin a poor performance rating, deny his promotion, place him on a PIP, and a PIP and fire) on his Chinese race and national origin. As such, for these reasons and the reasons expressed in Mr. Qin's opening brief, the summary judgment decision should be reversed.

### C.    The District Court's Order Should Be Reversed Because There Is Sufficient Evidence Supporting A Prima Facie Case of Discrimination

#### 1.    There Is Evidence Vertex Denied Mr. Qin's Promotion Because He Is Chinese

Here, again, Vertex argues that Ms. Kurtz was the sole decisionmaker Mr. Qin's promotion denial; but there is no evidence that Ms. Kurtz had anything to do with it. Ms. Kurtz stated that Mr. Qin's promotion denial was because he received a poor rating, Appx0282, which was based on Mr. Hart's racially motivated review

comment, Appx0851. This proves Vertex denied Mr. Qin's promotion because he is Chinese.

### 2.    Mr. Qin Has Pointed To Concrete Evidence To Prove Vertex Terminated Him Because He Is Chinese

Vertex argues that the comparator analysis involving Mr. Fred Yawe is only applicable to the performance rating of the two employees, not their termination/continued employment. Vertex defines "similarly situated" to mean someone who "did not become engaged in formal Vertex projects" in an attempt to mislead the Court that Mr. Yawe is not Mr. Qin's comparator. Vertex is wrong. Mr. Yawe is non-Chinese fellow architect in the same architecture and under the same manager, Mr. Harter. Appx1337. Mr. Yawe received the same poor rating during the same 2018 performance review period. Appx0793, 0987. Vertex's analysis ignores these critical facts, and also ignores the fact that Mr. Yawe was also reviewed as "not engaged," Appx1337-1338, which would qualify him as a comparator even by Vertex's wildly restrictive definition.

The fact is, Mr. Qin's non-Chinese comparator, Mr. Yawe, like Mr. Qin, also received a poor performance rating. Appx0793, 0987. Mr. Yawe was allowed to appeal his poor rating, Appx0987, received a good rating as a result, and thus avoided termination. On the other hand, Mr. Qin was not allowed to appeal his poor rating, Appx0541, and was put on a PIP as a result, which led to his termination. Mr. Qin was treated less favorably than his non-Chinese comparator

and was terminated while his non-Chinese comparator was not. The District Court's summary judgment decision did not even consider the comparator evidence in its decision. For these reasons and the reasons outlined in Mr. Qin's opening brief, the summary judgment decision should be reversed.

### D.    The Court Should Reverse the District Court's Order Because There Is Ample Evidence Proving Pretext

Vertex claims that "it is undisputed that Vertex perceived Mr. Qin to be insufficiently engaged . . ." citing parts of the record (Appx0281-0283, 0291-0292, 0526) that do not support its "lack of engagement" theory for its alleged non-discriminatory motive for the treatment of Mr. Qin. Vertex claims that Mr. Qin's engagement in Vertex projects was just his "perception" and "Mr. Qin tries to prove pretext . . .  by asserting . . . his perceptions about his engagement with projects . . ." Vertex is wrong.

First, there is no contemporaneous evidence that Vertex perceived Mr. Qin to be insufficiently engaged before his termination. "Lacking engagement"  as the reason for Mr. Qin's poor rating, promotion denial, PIP and termination showed up after the beginning of Mr. Qin's lawsuit. It is a post-hoc fabrication. This is clear from the evidence cited by Vertex:

1. Appx0281-0283: this is part of the Declaration of Jen Kurtz. It is dated September 17, 2021, more than two years after Mr. Qin was given a poor performance rating. Ms. Kurtz was one of the 4 raters who provided

feedback for Mr. Qin's review. She did not state anything about Mr. Qin's "lack of engagement" at that time. Appx0709-0712. Rather, she recommended "extending" Mr. Qin's Q2O work, which she assigned to Mr. Qin herself. Appx1339. Ms. Kurtz's post-hoc statement is inconsistent with the facts at the time of Mr. Qin's PIP and is not credible.

2.  Appx0291-0292: This is part of the Deposition of Norm Stahlheber, dated March 19, 2021—more than two years after Mr. Qin was given a poor performance rating. During the same deposition, Mr. Stahlheber stated that he was not aware of Mr. Qin's engagement in the Excise Tax Project, Appx0317, even though Mr. Qin sent him weekly work status reports on the project, Appx1048. Mr. Stahlheber's post-hoc statement is inconsistent with the facts during Mr. Qin's PIP period and is not credible.

3.  Appx0526: This is part of the Deposition of Andrea Falco, dated March 18, 2021. Ms. Falco's statements were made more than two years after Mr. Qin was given a poor performance rating. She stated that Mr. Qin's termination was due to failure to be engaged in any of the three projects listed on his PIP. Ms. Falco was in Vertex's HR (she did not supervise Mr. Qin or have any knowledge about his work) and she did not state anything about Mr. Qin's engagement in other Vertex projects.

It is clear from Vertex's evidence that the lack of engagement theory is a post-hoc fabrication. Therefore, Vertex's alleged non-discriminatory reason is pretext.

Additionally, Mr. Qin's engagement in Vertex's projects was not just "his perception." It is a fact and it was recorded in the other reviewer comments in the official document of Mr. Qin's 2018 performance review. Appx0708-0712. In particular, in footnote 28 on page 25 of Vertex's brief, Vertex claims that the Excise Tax Project was merely Mr. Qin's "belief" but the evidence cited by Vertex actually proves Mr. Qin did work on it. Vertex claims that "Mr. Qin testified he 'did not recall' if Vertex adopted the Excise Tax Project" (citing Appx0431). This is a lie—what Mr. Qin did not recall was the name of the leader of the Innovation Zone who invited Mr. Qin to work on the project. Here is the relevant testimony from Appx0430-0431, Mr. Qin's deposition:

Q. So who let you know that you could work on the excise tax project?

A. Someone -- some leader from innovation labs.

Q. But you don't recall who?

A. I could not recall. The e-mail system should recall that. I think it was Len Porcano.

Q. And what work were you supposed to do for the excise tax project?

A. To grow that excise tax capability -- to build up that capability. And the reason for that I can recall is that because of the fact all those excise taxpayers are under the pressure from State governments to collect those excise taxes from their international internet sales; so there's an urgent need for that.

Appx0430-0431. Vertex twisted the above dialogue to fit its argument that "Mr. Qin did not recall if Vertex adopted the Excise Tax Project" which is false.

Additionally, Vertex cites an email from Mr. Qin dated April 6, 2019, Appx1048. This is an email where Mr. Qin was reporting work performed during the week that had just passed (4/1/2019 through 4/5/2019). It partially reads, "Excise Tax, CampFire Stage – Innovation lab kick off, on-boarding, deliverables identification, id customers for investigation/discussion." Appx1048. This clearly shows that during that week, Mr. Qin was working on the Excise Tax Project, in its CampFile Stage; and the email also lists the specific tasks performed. This proves that Mr. Qin's engagement in the Excise Tax Project was not a belief or perception, but real and factual.

Vertex also cited Appx1294 as evidence that the Excise Tax Project was only Mr. Qin's belief or perception. The cited document is an invitation from Mr. Qin to Mr. Len Porcano, who was a leader in the Innovation Zone (IZ); and the purpose of the meeting was to review the progress of the CampFile Stage for the Excise Tax Project. Appx1294. This document also clearly shows that Mr. Qin was engaged in the project at the time.

From Vertex's cited materials, it is obvious that Mr. Qin had been actively engaged in the Excise Tax Project.

Vertex also argues that Mr. Yawe is not a comparator, which is refuted above.

At the end of the day, Vertex's claimed "lack of engagement" theory—its supposed legitimate nondiscriminatory reason—is pretext. The District Court failed to consider these genuine issues of material fact. For the reasons stated in Mr. Qin's opening brief and the reasons stated above, the summary judgment decision should be reversed.

### E.    The Court Should Reverse The District Court's Order On Retaliation

#### 1.    Mr. Qin Did Not Waive Any Challenge To The Issue Of Pretext For The Retaliation Claim

Mr. Qin appeals from the District Court's summary judgment decision. Here, the District Court explicitly decided to decline to engage in the McDonnell-Douglas burden-shifting framework regarding Mr. Qin's retaliation claim. There was explicitly no holding on the issue; and to the extent there was, the Court relied entirely on the disparate treatment analysis, which Mr. Qin analyzed in his opening brief.

Vertex argues that the "Court already found that there was insufficient evidence to cast doubt on Vertex's stated reason (lack of engagement and failing the PIP)" however as pointed out in Mr. Qin's opening brief, that analysis was based upon factual and legal errors and therefore the summary judgment decision should be reversed.

Vertex also argues that "Mr. Qin is obligated to point to concrete evidence to prove every element of his claim. Mr. Qin cannot win on his retaliation claim without proving pretext." But Mr. Qin's appeal is based on the issues raised in the District Court's summary judgment decision; not the merits of case. Mr. Qin spent a significant portion of his 56-page summary judgment opposition brief arguing the issue of pretext with respect to the retaliation claim, and the District Court deprived him of a jury after completely refusing to review Mr. Qin's analysis of pretext. Mr. Qin did not waive any challenge to the issue of pretext because the issue was not raised in the District Court's opinion in the first place.

### 2.    Mr. Qin's Questions Are Protected Activity

Vertex argues that Mr. Qin's questioning Mr. Harter whether his longtime non-promotion was due to his race or national origin is a question to "[seek] answers to things he expressed no opinion about," and it states that Mr. Qin "was not participating in an ongoing investigation providing evidence to support the conclusion an individual discriminated against someone." Here, Mr. Qin's questioning clearly shows that he was investigating evidence supporting his belief that his longtime non-promotion was due to his race and national origin. Mr. Qin also unequivocally testified that his confrontation of Mr. Harter was a complaint of discrimination. Appx0395. Mr. Qin's questioning was an expression of a complaint

that his longtime non-promotion was due to his Chinese nationality. Therefore, Mr. Qin's questioning of Mr. Harter is protected activity.

Vertex also considers Mr. Qin's meeting with Ms. Andrea Falco, in which he asked for details on Vertex's antidiscrimination reporting procedures, "just a question." Vertex states that "Ms. Falco asked Mr. Qin whether he wanted to report anything, and he said no" (citing Appx0534) in an attempt to prove this is not protected activity. Here, Vertex ignores the fact that, at Vertex, there was no public information on how to file a complaint of discrimination (no names, no phone numbers, no email addresses, no forms to fill in) and Mr. Qin had no choice but to meet with Ms. Falco to find out the details. Appx.0648. Further, during the meeting with Ms. Falco, Mr. Qin did not "report" anything because at that point in time, Mr. Qin did not yet know what the formal reporting procedures were, and simply could not formally complain due to the lack of specific reporting details. Since Mr. Qin's inquiry into the reporting procedures was a required and integral part of formally filing a complaint of discrimination, it is protected activity.

For these reasons and the reasons outlined in Mr. Qin's opening brief, summary judgment should be reversed.

### 3.    Mr. Qin's Complaints Are Causally Related to Vertex's Adverse Actions

Vertex claims that "(1) Ms. Kurtz was responsible for denying Mr. Qin's promotion request after Mr. Harter approved it (Appx0281-0282); (2) Ms. Kurtz

did not know about Mr. Qin's question to Mr. Harter or any complaint from Mr.

Qin." However, the evidence cited by Vertex (Appx0281-0282) proves otherwise.

Ms. Kurtz's declaration, Appx0282, states, "Logically, since the team agreed to

assign Mr. Qin a rating of 'Usually Meets Expectations,' which meant that he was

not always fully performing all expectations of his role, the question of his

promotion request was also settled. A promotion would have required Mr. Qin to

show that he was going above and beyond in his role." Appx0282.

The decisionmakers for Mr. Qin's performance rating were Mr. Harter and the

Calibration Team. Appx0282. At least three of the decisionmakers, Mr. Harter, Ms.

Falco, and Ms. Sakowitz, were aware of Mr. Qin's complaints and investigation

activities; and his intent to file a formal complaint. Appx0648, 0856, 0995. The

decisionmakers retaliated against Mr. Qin for his protected activity by giving him a

poor performance rating, which resulted in the denial of his promotion. There

causal connection between Mr. Qin's complaints and Vertex's adverse actions is

clear.

Vertex also argued that Mr. Harter "approved Mr. Qin's promotion request" and

"assigned Mr. Qin a 'Strong Contributor' rating" after Mr. Qin's protected

activities in an attempt to show Vertex did not take the first opportunity to retaliate

against Mr. Qin. The fact is that after Mr. Qin's protected activities, the first

opportunity Vertex had to take adverse action against Mr. Qin was at the end of his

2018 performance evaluation when it was time to give him his official rating for the year. Mr. Harter was only one of the decisionmakers who decided Mr. Qin's rating (along with the Calibration Team). Appx0282. Mr. Harter's approval of the promotion and assignment of a Strong Contributor rating was his initial, preliminary, unofficial decision—not Vertex's official decision on Mr. Qin's 2018 performance rating. Appx0708-0712. Therefore, his initial approval and assignment was not the first opportunity Vertex had to retaliate. Vertex took the first opportunity after Mr. Qin's protected activities and chose to officially assign Mr. Qin a poor rating, which also resulted in its denial of his planned promotion. Appx0282.

Vertex also argues that Mr. Qin cannot prove causation under the "timing plus other evidence rule" because, Vertex says, "there is no 'plus' here." Vertex attempts to mislead the Court that temporal proximity is the only evidence upon which Mr. Qin bases his causation analysis. Vertex ignored all of Mr. Qin's relevant evidence of causation, including the following:

1. Vertex prohibited Mr. Qin from appealing his poor performance rating, Appx0541, while his similarly situated non-Chinese colleague, Fred Yawe, was allowed to appeal, Appx0799, 0987.

2. On March 31, 2019, Mr. Qin complained about Mr. Hart's racially motivated review comment. Appx06650. On April 1, 2019, Vertex placed Mr. Qin on a PIP, Appx0719-0721, which ultimately led to his termination.

3. Vertex knowingly kept barriers in place that prevented Mr. Qin from succeeding on his PIP, Appx0720, 0436, thus ensuring Mr. Qin would be terminated at the end of the PIP.

4. On May 1, 2019, Vertex's own investigation concluded Mr. Hart's racially motivated review (which caused Mr. Qin's poor rating) was "viewed as discriminatory" and "not appropriate." Appx0652. Vertex removed the comment—the only negative one on Mr. Qin's 2018 performance evaluation—but it still kept his poor rating, kept him on the PIP, and terminated him on May 16, 2019.

There is not only temporal proximity, but also ample other "plus" evidence showing a pattern of antagonism against Mr. Qin after he complained about discrimination on a number of occasions. Thus, for these reasons and the reasons outlined in Mr. Qin's opening brief, summary judgment should be reversed.

### 4. Mr. Qin's March 31, 2019 Email Supports His Retaliation Claim

Vertex asserts it "indisputably informed Mr. Qin of the PIP on February 8, 2019, more than a month before the email and he was actively working on it with Mr. Stahlheber (Appx0492-0493). Mr. Qin merely signed the PIP on April 2, 2019."

This is an attempt to convince the Court that Mr. Qin's complaint on March 31, 2019 occurred after his PIP had already started, which is false. The evidence cited by Vertex does not state when Vertex informed Mr. Qin of the PIP not does it state anything about Mr. Qin working on it with Mr. Stahlheber. The deposition testimony of Mr. Harter, cited by Vertex in support of these averments, states as follows:

> A. ...it was just emphasizing things we had been talking about for a few months. A lot of this was not new to anybody. So we just, you know, brainstormed a little more about possible solutions since I wasn't going to be involved in a performance improvement plan. I mentioned to him what my knowledge of what one of those looks like, and what they try to do and how they are. But that was all in kind of Lois' I believe. And soon after this, in Norm's hands, Norm Stahlheber. In that timeline I'm not sure when we physically made the management switch.

> Q. When you said that this is a continuation conversation that you had been having for months with Mr. Qin, can you talk about specifically what you are referencing?

> A. Well, referencing fit to strategic opportunities and better collaboration. We had been talking about that for a while. That showed up in his review. You saw some details there on feedback. Now it is coming back to me, Norm and Lois were both part of the calibration team for developments. I'm sure they went through many of those in that week or two. People that were in usually meets or exceeds categories, that they drove that process. You can see Lois driving the process right now. That's what that was all about, driving the calibration team's process. I would have been involved in the PIP, the things we discussed were things we discussed before about fitting the strategic things, better collaboration to do. And making sure you are focused on better outcomes. I don't think there is anything new there. Creativity came when you put that performance improvement program, PIP program. You put that together about exactly how you do that. So that is kind of where I'm -- unless you have something else to remind me. That is where I kind of fell off I guess and Norm took over I believe.

Q. You had also mentioned about trying to get Mr. Qin involved in strategic projects and hearing some feedback from project managers about Mr. Qin's engagement, is that right?

Appx0492-0493. Clearly the evidence cited by Vertex is irrelevant to its claim that "Vertex indisputably informed Mr. Qin of the PIP on February 8, 2019, more than a month before the email and he was actively working on it with Mr. Stahlheber." The statement is baseless, and it is false.

As for the official start of Mr. Qin's PIP—the date was April 1, 2019. Appx0721, 0788, 0978. The PIP started after Mr. Qin's email on March 31, 2019, when he complained about Mr. Hart's racially motivated review. The PIP ultimately led to Mr. Qin's termination. The temporal proximity strongly supports the causation connection.

Vertex also stated that "the record is devoid of any other 'plus' evidence to show causation" implying that temporal proximity is the only evidence of causation, while ignoring all the relevant material facts. After Vertex learned of Mr. Qin's protected activities, it decided to assign Mr. Qin a poor performance rating. The poor rating gave Vertex the opinion to put Mr. Qin on a PIP. Appx0292. Because Vertex knew that Mr. Qin had taken the initial action to file a formal complaint, Appx0648, it used the threat of a PIP to pressure Mr. Qin to sign a General Release Agreement in order to avoid a potential lawsuit. Appx0996. But Vertex could not find any performance issues, so it gave Mr. Qin a blank form and

forced him to find his own non-existent performance issues to improve on. Appx0247-0248. This proves that Vertex assigned Mr. Qin a poor rating without any basis and that retaliation is the real reason for its actions.

Mr. Qin drafted his own PIP, which initially included four items. Appx0715-0717, 0788. Meeting one of these items would have let Mr. Qin succeed on the PIP. Appx0521, 0289. However, Vertex removed the fourth item. Appx0316. The item that Vertex removed would have let Mr. Qin succeed on the PIP because he was engaged in the Excise Tax Project during the PIP period. Appx1048. This shows Vertex intended for Mr. Qin to fail the PIP so the company could fire him, and the PIP was not to improve his performance. These facts, along with the other evidence outlined above, proves Vertex engaged in a pattern of antagonism against Mr. Qin after he complained. Vertex's analysis—and the District Court's analysis—ignores these material facts.

Vertex further asserts that "as for the termination theory, Mr. Qin cannot establish causation based on temporal proximity or any other evidence. More than six weeks passed between the email and the termination." Here, "six weeks" refers to the time period between April 1, 2019 and May 16, 2019, when Mr. Qin was terminated. This six week period was the entire PIP period. Vertex ignores the fact that the PIP was designed to fail Mr. Qin to begin with. Therefore, the termination process began at the official PIP start date, April 1, 2019, which was immediately

after Mr. Qin's complaint email on March 31, 2019. The following evidence shows the PIP process was a fake one and was designed to fail Mr. Qin:

1.  There were no performance issues for Mr. Qin to improve on. Vertex forced Mr. Qin himself to identify his non-existent performance issues to push him to sign a General Release Agreement. Appx0247-0248. Vertex did not identify any performance issue on the part of Mr. Qin for his PIP.

2.  Vertex removed the fourth item from Mr. Qin's PIP draft, which would have allowed Mr. Qin to succeed on the PIP. Appx0316. Vertex intentionally designed the PIP to fail Mr. Qin.

3.  There were barriers to succeed on the PIP (no decisionmakers to approve Mr. Qin's requests to engage in the projects); and Vertex knowingly kept those barriers in place so that Mr. Qin could not succeed on the PIP. Appx0720. Vertex itself decided not to let Mr. Qin engage in any of the projects.

This evidence shows that Mr. Qin's termination process effectively started with the start of his PIP because Mr. Qin was guaranteed to fail the PIP, which started on April 1, 2019 right after his complaint email on March 31, 2019.

Further, Mr. Qin's PIP was originally intended to end on May 3, 2019 when he would be terminated. Appx0290, 0525. However, on May 1, 2019, Vertex concluded its investigation on Mr. Hart's racially motivated review and found that

the language of the review was viewed as "discriminatory" and "not appropriate." Appx0652. In an attempt to avoid the risk of a lawsuit, Vertex extended Mr. Qin's PIP another two weeks to pressure him to sign a General Release Agreement. Vertex removed the review comment—the only negative one—from Mr. Qin's 2018 performance review. Appx0652. Yet Vertex kept Mr. Qin's poor rating and kept him on the PIP. This shows that the real purpose of the PIP had nothing to do with Mr. Qin's work performance, it was designed to pressure him to sign a release or to terminate him as retaliation for his complaint of discrimination. The District Court failed to consider any of these material facts in its summary judgment decision. Thus, for these reasons and the reasons outlined in Mr. Qin's opening brief, summary judgment should be reversed.

### 5.    The Court Should Reverse The District Court's Order Because There is Evidence Showing Pretext For Retaliation

As demonstrated above and in Mr. Qin's opening brief, the District Court's opinion failed to consider all of the critical facts and evidence supporting Mr. Qin's showing that Vertex's reasons for its treatment of Mr. Qin was pretext.

### Conclusion

For the foregoing reasons and the reasons in Mr. Qin's opening brief, the judgment of the District Court should be vacated and the case remanded for further proceedings.

Respectfully submitted,

*/s/ Ian M. Bryson, Esquire*
Ian M. Bryson, Esquire
Dated: <u>August 30, 2023</u>          *Attorneys for Qing Qin*

## CERTIFICATE OF BAR MEMBERSHIP,
## COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I, Ian M. Bryson, counsel for Qing Qin, certify, pursuant to Local Appellate Rule 28.3(d) that I am a member in good standing of the Bar of the Court of Appeals for the Third Circuit. I further certify, pursuant to the Federal Rules of Appellate Procedure 32(a)(5)-(7) and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Brief of Appellant is proportionately spaced and has a typeface of 14-point Times New Roman, contains 5,067 words (not counting portions excluded from the word count by Rule 32(f)), and that the text of the electronic brief is identical to the text of the paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that Avast Free Antivirus Protection has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ Ian M. Bryson, Esquire*
Ian M. Bryson, Esquire
Dated: August 30, 2023                    *Attorneys for Qing Qin*

## CERTIFICATE OF FILING AND SERVICE

I, Ian M. Bryson, Esquire, hereby certify pursuant to Fed. R. App. P. 25(d) that, on August 30, 2023, the foregoing Reply Brief for Plaintiff-Appellant was filed through the CM/ECF system and served electronically. Seven copies will be filed with the Court within the time period provided in the Court's rules via Express Mail.

*/s/ Ian M. Bryson, Esquire*
Ian M. Bryson, Esquire
Dated: August 30, 2023          *Attorneys for Qing Qin*